# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00834-CV

---

**C. S. B., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-17-001541, THE HONORABLE TIM SULAK, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Appellant C.S.B. ("Mother") appeals from the trial court's decree terminating her parental rights to her daughter K.B. ("Kaylee"), who was two years old at the time of trial.[1] As explained below, we will affirm the decree of termination.

### Standard of Review

To terminate a parent's rights to her child, the Texas Department of Family and Protective Services ("the Department") must prove by clear and convincing evidence that the parent engaged in conduct that amounts to statutory grounds for termination pursuant to section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001; *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or

---

[1] To protect her identity, we will refer to the child by an alias. *See* Tex. R. App. P. 9.8. The trial court also terminated Kaylee's father's parental rights, but he has not appealed.

degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). When we are asked to review the sufficiency of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In evaluating the legal sufficiency of the evidence, we look at "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Williams v. Williams*, 150 S.W.3d 436, 449 (Tex. App.—Austin 2004, pet. denied). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and will "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *J.F.C.*, 96 S.W.3d at 266. Our review does not require that we disregard undisputed evidence contrary to the determination. *K.M.L.*, 443 S.W.3d at 113. If after viewing the evidence in the proper light, including undisputed evidence that does not support the findings, we conclude that no reasonable factfinder could have formed a firm belief or conviction that the Department carried its evidentiary burden, the evidence is legally insufficient. *J.F.C.*, 96 S.W.3d at 266; *Williams*, 150 S.W.3d at 449. In considering the factual sufficiency, we consider the entire record and ask whether the "disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266. If the disputed evidence that could not be credited in favor of the finding is so significant that a reasonable factfinder could not have formed a firm belief or

2

conviction as to the truth of the Department's allegations, we will hold that the evidence is factually insufficient. *Id*.

## Factual and Procedural Summary

Mother was almost seventeen years old when Kaylee was born in March 2016; she was nineteen at the time of trial. Kaylee has Alagilles Syndrome, a genetic disorder that affects her liver, heart, and other organs. In March 2017, the Department filed its petition seeking conservatorship over the child. In its supporting affidavit, Department investigator Iesha Pillow explained that the Department had received a referral alleging medical neglect by Mother. The referral alleged that Mother had missed an appointment to get Kaylee's medically prescribed formula and gave "conflicting stories about having enough formula." The referral further alleged that Kaylee needed a liver transplant and that Mother discussed transplant options with a specialist in late 2016, but then declined to place the child on the wait list, stating that "nature will take its course and take care of it." According to the referral, Kaylee weighed twelve pounds and was "experiencing failure to thrive," vitamin deficiencies, and jaundice; Mother had missed some "critical doctors' appointments"; and Mother had declined a feeding tube procedure recommended by Kaylee's doctors. The referral alleged that Kaylee's medical conditions could be fatal if not treated properly and that Mother was not receptive to offers of help and "does not seem to take [Kaylee's] medical conditions seriously." The Department attached a letter written by a pediatric dietician at the Dell Children's Medical Center, explaining Kaylee's medical specialists' concerns about her health, Mother's responses, and the care Kaylee had been receiving at home.

3

After an initial investigation, Kaylee was removed from Mother's care and placed in a foster home. During the pendency of the case and while she was in the care of her foster parents, Kaylee received a liver transplant, and a nasogastric feeding tube ("NG-tube") was inserted.[2] Mother complied with many of the requirements placed on her by the court, but she did not fully comply with requirements related to her mental health and her ongoing use of marihuana. She also missed many of Kaylee's doctor's appointments and visitations. The Department eventually sought termination, resulting in the underlying bench trial.

During the seven-day trial in November 2018, the trial court heard testimony by Pillow; Mother; her mother, with whom she and Kaylee lived ("Grandmother"); Megan Dryer, the family's Any Baby Can caseworker; CASA volunteer Elizabeth Rosenbaum; Department caseworker Erin Mark; Kaylee's foster mother Crystal Pearson; Department investigator Jennifer Williamson; Alise Fulton, who supervised many of Mother's visitations; the doctor who performed Mother's psychological evaluation; Mother's therapist; several members of Kaylee's medical team; three of Mother's relatives; and several witnesses who had been involved in providing services to Mother during the pendency of the case.

Pillow testified at trial that in investigating the 2017 referral, she interviewed some of Kaylee's dieticians and social workers, who were concerned that mother was not paying attention during medical appointments and "doesn't understand the severity of [Kaylee's] condition." They also told Pillow that they had concerns about Kaylee's need for a liver

---

[2] An NG-tube is a small tube inserted in a patient's nose down to the stomach so that medications and formula can be provided. The NG-tube was recommended by multiple doctors and the dietician to help increase Kaylee's calorie intake, to address her tendency to vomit after eating, and to make it easier to administer her medications. The outer end is taped to Kaylee's cheek, and because of skin irritation, the tube must be carefully removed and switched from one side to the other every week or so. It also requires special training on how to keep it clean, how to administer formula and medications via the tube, and how to remove and replace it.

transplant because she would need "a stable environment because of rejection medications, higher risk of infection," and the medical team did not feel Mother and Grandmother "would even be ready for the transplant."

Pillow interviewed Mother and Grandmother at the apartment they shared with Kaylee and Mother's younger sister. While Pillow was waiting to speak to Grandmother, several people came in and out of the residence, including two people who "appeared to be under the influence"—a woman who was "zigzagging down the hall" and a man who also "appeared to be under the influence. His eyes were low. He was slurring his words." Pillow testified that by the time she left, there were at least ten people present, smoking cigarettes and drinking beer and wine. Grandmother told Pillow that those individuals did not reside in the apartment, but Pillow was concerned about the situation because of Kaylee's medically fragile condition. Pillow asked Grandmother about her drug use, and Grandmother admitted that she smoked marihuana every day. Although Grandmother told Pillow that she believed Kaylee needed a liver transplant and NG-tube, she said that those decisions were up to Mother, not her.

When Pillow interviewed Mother, she confirmed that she had missed an appointment at the Women, Infants, and Children ("WIC") office to get Kaylee's prescription formula. When Pillow asked about Kaylee's formula and medications, Mother said that Kaylee "ate a lot" and had gained seven ounces but "really couldn't give me too much information about . . . what medications needed to be taken when." Pillow asked to see Kaylee's medications, but Mother did not have them; she told Pillow "that she had to go and get the other medication from the pharmacy, and she would do it tomorrow." Mother explained that she had missed or was late to some appointments because of a lack of transportation but said that her transportation issues had been addressed.

5

Pillow testified that she noticed a smell of cigarettes and marihuana in the residence and that the smell of marihuana was strong in the room Kaylee shared with Mother. Their room was cluttered with trash, there were roaches present, and bottles of Kaylee's formula were on the floor. Pillow testified that the clutter concerned her because it could be a choking hazard for Kaylee. The dirtiness of the residence, including the visible roaches, also raised concerns because Kaylee is "medically fragile" and would require a heightened level of cleanliness after a liver transplant. Further, Kaylee's portable crib was filled with clothing and trash, and Mother said she slept in the same bed with Kaylee "because she didn't want to get up in the middle of the night to have to get her if she was crying." Pillow discussed "safe sleep" with Mother and explained that Kaylee's small size made sleeping in the same bed dangerous, and Mother said she would clean out the crib.

The Department introduced into evidence an audio recording of Pillow's interview with Mother, in which Mother explained her concerns about the liver transplant surgery, the possibility of rejection, reactions to the medications, and other potential side-effects. In the recording, Pillow asked if Mother had ever said that if Kaylee died, it was "nature taking its course," and Mother said that she had not and that "I feel like God's plan might not be for her to get the transplant." She also said that she was going to put Kaylee on the transplant list but that she had not yet done so because she was not "for sure saying yes." Mother said that Kaylee had been doing well recently and was gaining weight and that Mother had not agreed to have a feeding tube inserted because Kaylee had pulled one out of her nose when she was an infant. Pillow asked more about Mother's religious beliefs and Kaylee's conditions, and Mother said, "God is going to pick the way she's going to live." She also said that she was keeping an open

mind about medical treatment, that she would get Kaylee medical attention if her condition worsened, and that she would not simply think it might be "God's will for her to die."

After Pillow's interviews, the Department sought emergency conservatorship. The next day, Pillow and some other Department personnel met Mother and Kaylee at a coffeeshop. When they explained that they were taking custody of Kaylee, an unidentified individual took Kaylee back to the apartment building, where she was passed from apartment to apartment in an attempt to elude the Department. During that time, Pillow testified, Mother, Grandmother, and Mother's younger sister would come out and curse and yell at Pillow and then retreat into their apartment. After several hours, Kaylee was given to the Department, at which time she was brought to the hospital and found to have a low-grade fever and to be "severely dehydrated." She was in the hospital for about two days and released to a foster home with experience in complicated medical conditions. Kaylee had an NG-tube installed in August 2017, several months after being in the foster home. She was placed on the transplant list in February 2018 and had the transplant surgery in late June 2018, about five months before trial.

Hospital social worker Jacqueline Frausto made the referral that initiated Pillow's investigation. She testified that in March 2017, she received a report from the medical staff that Kaylee was failing to thrive. Frausto was informed that Mother had missed at least two appointments with specialists and had told a nurse that medical staff "just have to call me" to arrange for new appointments and that she would not reach out herself to do so. Frausto next spoke to Megan Dryer, the family's Any Baby Can caseworker, who told Frausto that "the situation wasn't good," that she had been unable to reach Mother in a week because Mother's phone was not working, and that she would be going to see Mother and Kaylee soon. Finally, Frausto spoke to the clinic's dietician and the WIC office, which confirmed that Mother had

7

missed two appointments to pick up Kaylee's prescribed formula. Frausto then made her referral to the Department, which initiated Pillow's investigation.

Megan Dryer testified that Any Baby Can had offered Mother case management and physical therapy services and that Mother "had a really hard time maintaining" visits with Kaylee's physical therapist—"[a] lot of visits were canceled or we would go to the home and she wouldn't be there"—and declined an offer for more frequent physical therapy for Kaylee. In November 2016, Mother told Dryer that she had declined Kaylee's doctors' recommendations for an NG-tube, and when Dryer asked why, Mother "just expressed disinterest in learning about how to utilize the NG-tube." Dryer further testified that in about January 2017, Mother told her that she had taken Kaylee off the liver transplant list,[3] saying, "quote, God was going to save her baby. God would—God was going to make sure [Kaylee] was okay." Dryer expressed her concerns, noting Kaylee's yellowed eyes and encouraging Mother to keep her on the list and to have an NG-tube inserted. Dryer testified that whenever she spoke to Mother about the NG-tube or liver transplant, "the term that [Mother] used the most was 'God is going to heal my baby.'"

Dryer stated that she would periodically visit the family's residence to check on the family. The apartment appeared to be fairly clean for her visits, and Dryer never observed a roach problem. Dryer smelled marihuana in the apartment "a few times" but she never asked Mother or Grandmother about it, nor did she report it to anyone. Grandmother usually "seemed annoyed" by Dryer's visits and would not answer questions about how Kaylee was doing, instead referring Dryer to Mother. When Dryer would speak with Mother, she "was typically laying in bed, on her cell phone. Getting her engaged in the conversation was difficult. She

---

[3] Either Dryer misunderstood Mother or Mother misspoke about Kaylee being removed from the transplant list because the evidence establishes that Kaylee was not put on the list until well after she was removed from Mother's care.

wasn't always able to answer questions about [Kaylee's] health, when doctors' appointments were going to be." When Dryer attempted to give Mother advice on organizing Kaylee's medical information and appointments, Mother "was pretty flippant" and dismissive and "[r]olled her eyes a lot." Kaylee was usually present, and Mother sometimes talked to or played with her but often did not appear to be engaged with the child.

Dryer was asked whether she had concerns about Mother's parenting, and Dryer said, "Yes. She seemed to be very apathetic, uninterested, not concerned, whereas typically a parent that has a child that is so medically involved would be able to give me more information, would appear to be more concerned about what was going on." Dryer attributed some of Mother's apparent lack of concern to her young age and "a lot of it to what appeared to be lack of support" from Grandmother.

Dr. Marisa Izaguirre, Kaylee's pediatric gastroenterologist, testified that before Kaylee's removal, she had prescribed a concentrated formula, several vitamin supplements and about six medications for Kaylee, all attempts to help her gain weight. Kaylee's medical records reflected concerns that someone had diluted Kaylee's formula and that she had been given juice by Mother and at daycare. Dr. Izaguirre reviewed Kaylee's records at trial and noted that her growth in height seemed to slow and "plateau" from about six months' old to her removal and that since then, she has had "a good increase" in her height. There was a similar pattern in Kaylee's weight gain, but it was "[n]ot as distinct." Dr. Izaguirre testified that at the time of the referral to the Department, she was not concerned that Mother was neglecting Kaylee's medical needs. Instead, she was concerned about "the complexity of what she has going on" and about the reports related to Mother's missing appointments to get Kaylee's formula or prescriptions.

9

Dr. Izaguirre said that Kaylee first saw a transplant team in July 2016, and that Mother brought her to Dallas for further evaluation by transplant specialists in September 2016 and January 2017. Doctors recommended a liver transplant at both follow-up appointments, but Kaylee was not put on the transplant list because of:

> mom's hesitancy to move forward with liver transplant and concern about if there was another additional caregiver who could help following liver transplant. . . . [I]t takes a lot of work to take care of a patient immediately after liver transplant. A lot of times there are changes in medications. There's lots of follow-up visits. You know, should one caregiver be ill or, you know, for whatever reason not be available, it's always good to have a backup person who kind of knows the care and who can kind of fill in.

Dr. Izaguirre's notes also indicate that in February 2017, Mother said that she would consider an NG-tube but that she wanted to give Kaylee one more month of drinking formula by mouth first to see if she gained weight without the tube.

Stephanie Khoury, Kaylee's primary pediatric dietician, testified that it was "kind of hard to communicate" with Mother, that she could not always tell if Mother understood the instructions, and that Mother was "kind of distracted" sometimes. Even after Mother was given written and verbal instructions about Kaylee's formula, Khoury learned that that the formula had been diluted against instructions. Further, some of Mother's reports about the quantity Kaylee was eating "didn't make sense" in light of Kaylee's slow weight gain. Shortly before Kaylee's removal, she was switched from infant to toddler formula. Khoury gave Mother "a fair amount of" samples of the new formula and told her to call back with Kaylee's flavor preferences, but Khoury grew concerned because she learned Mother had missed "multiple" WIC appointments and because Mother was vague about how much formula she had, whether she had her WIC card

10

to get more, and whether she was giving formula or plain milk to Kaylee. Khoury also testified that she asked Mother about the liver transplant, and Mother's response was:

> I think she wanted to continue to try to do whatever she could to make her better, but I think she basically said that she was going to let [Kaylee] like die in her own timing. Whenever that was going to happen, she was going to let it happen.

Department caseworker Jennifer Williamson testified that several months before Pillow's investigation, the Department received another referral alleging that Mother was too rough in her treatment of Kaylee. As part of her investigation, Williamson went to the family's residence, which she observed to be clean and tidy. She also observed sufficient supplies for Kaylee, including diapers and formula. When Williamson discussed Kaylee's medical conditions with Mother, Mother seemed "pretty knowledgeable," "especially given her age." Williamson testified, "I was impressed that she was able to articulate what the baby needed." Williamson confirmed that Mother had been attending Kaylee's doctor's appointments and "doing everything that she needed to do." Williamson said that her only concern was Mother's "co-sleeping" in the same bed with Kaylee, that she educated Mother about why she should not co-sleep with Kaylee, and that the Department provided the family with a portable crib.

Williamson closed the case, ruling out the allegations. However, Williamson said that did not mean another investigation several months later would be improper or lead to the same conclusions that she had reached:

> I mean, as I said before, you know, a lot of families that we work with, things change very, very quickly. So I mean I've had families I've worked with where things were great, and a month later, I'm removing their children because something happened.

Williamson also agreed that her conclusions might have been different if Mother's family members had refused to talk to her, if she had smelled marihuana in the home, or if she "had learned that another social worker had talked to [Mother] about the dangers of co-sleeping and provided her with a play pen; and yet, she was still co-sleeping with her daughter."

Crystal Pearson, Kaylee's foster mother, testified that Kaylee's doctors discussed the necessity of an NG-tube in March 2017, immediately after her removal from Mother's care, but decided to "wait and see how she did in my care before they would place one." Kaylee's NG-tube was not inserted until August 2017, and Pearson explained that Kaylee initially drank her formula "fairly well" on her own but eventually stopped taking her bottles because she did not like the taste of the various medications that were mixed into the formula. It was at that point that the tube was put in. Pearson talked about the training she received about caring for and replacing Kaylee's NG-tube and said that Mother was offered the same training, attended one session, "said she would come back whenever she could do it," and did not attend any further training sessions. Kaylee was put on the transplant list in February 2018, had the surgery in late June 2018, and remained at the hospital until mid-August. After the surgery, Kaylee was prescribed about fifteen medications, but by the time of trial about three months later, she was taking nine medications, often by way of the NG-tube.

Pearson said that Mother was generally appropriate with Kaylee during visitations, but she recounted two incidents that concerned her. In the first, Kaylee kept saying "cars" or "trucks" as she watched vehicles drive by outside, and Mother said "she liked it better when [Kaylee] was silent, told her to quit talking." Later, Mother got upset at Kaylee "about something, pushed [Kaylee] out of the chair and then told her she couldn't touch her blanket, pulled her blanket away from her." She also expressed concern that after Kaylee's transplant

operation, Mother, while sick, insisted on kissing Kaylee on the face despite having been cautioned not to do so. Mother testified initially that she had allergies and was not sick, but later in her testimony admitted that she was sick but said that she "knew how to remove myself if I cough. I know how to remove myself if I sneeze. I know how to wash my hands."

Mother, Pearson, and Alise Fulton, who supervised many of Mother's visitations, testified about an incident that occurred in December 2017, when Kaylee's NG-tube got snagged on Mother's hand and pulled at least partially out so that "it was hanging from her nose." Kaylee began to cry, and Mother, who had not had training on the NG-tube, obtained scissors and cut the tube. Fulton said that Mother did not first ask if that was the proper response, tell Fulton what she was doing, or tell anyone after she cut the tube. Mother, on the other hand, explained that she cut the tube to stop Kaylee from crying and to keep her from tripping on it or putting it in her mouth. She also testified that Fulton got the scissors, disputing Fulton's testimony that Mother obtained the scissors and that Fulton was not aware that Mother intended to cut the tube.

Pearson was not present when Mother cut the tube, but she testified that Kaylee had to have a replacement tube inserted and then had to have a second, better-fitting replacement tube inserted later that evening, which were "two traumatic incidents that day." Dr. Izaguirre testified that Kaylee's NG-tube was cut "close to the insertion near her nose"; that it was "concerning that it was cut in general"; and that its being cut close to Kaylee's nose was additionally concerning because "the part that was cut that was already inside could slip down further into the GI tract, into the stomach, and that would be a retained foreign body, which would need to be removed" via a minor surgical procedure.

Fulton supervised Mother's visitations for about a year and testified that Mother was generally gentle and appropriate with Kaylee. However, Mother was twice told not to "pop"

13

Kaylee on the hand or the bottom for discipline, and Mother once "shoved" and "thumped" Kaylee's young cousins on the head when they played rough with Kaylee. Further, Mother never brought diapers for her visits despite being asked several times to do so, although she periodically brought clothes for Kaylee. Finally, another caseworker testified that although Mother's visits with Kaylee were usually loving and appropriate, she witnessed Mother got upset when Kaylee referred to her foster mother as "mama," at which time Mother:

> took the child upon her lap and said, you know, You need to call me mama. I observed her withholding toys and withholding food asking the child to call her mama. When she asked [Kaylee] to hug and kiss her, [Kaylee] said no. And then [Mother] roughly put her on the floor and said, Well, get off me then.

Sulipsa Luque, outpatient manager at the treatment center where Mother received substance abuse treatment and therapy, testified that Mother tested positive for marihuana use throughout the five months that she received services at the treatment center. Although Mother was always willing to participate, she had inconsistency and attendance problems, attending twenty-six sessions but missing twenty-six sessions, sometimes due to Kaylee's medical appointments or visitations. She was eventually discharged for "chronic noncompliance." Counselor Michelle Wise testified that she saw Mother a total of four times in the summer of 2017 and discharged her after her third missed therapy session. Wise said that Mother minimized her involvement in Kaylee's removal and that she was not sure whether Mother "really understood the importance of caring for her daughter in the way that the doctor had asked her to." Wise testified that Mother understood the seriousness of the situation but did not seem to grasp the need for consistency in caring for Kaylee. Mother told Wise that she was "okay

with the liver transplant" but only if it was "absolutely necessary" due to the side effects and the seriousness of the operation.

Mother disputed much of the Department's evidence. She testified that she was aware of the details of Kaylee's medical needs, that she was willing to have an NG-tube placed, and that she had told the doctors she wanted to give Kaylee one month after her first birthday to see if she could gain sufficient weight without the tube. Mother also said she had been willing to put Kaylee on the transplant list but had concerns about the aftereffects and wanted to be sure Kaylee had grown enough to undergo the surgery. Asked about the concerns related to her missed WIC appointments and whether she had enough formula for Kaylee, Mother testified that she had picked up a case of sample bottles from Khoury, sufficient to last about eight days, shortly before Kaylee was removed.

Mother testified that she had used marihuana before getting pregnant with Kaylee, that she stopped while she was pregnant, and that she resumed her use several months after Kaylee was born. She said that she never smoked marihuana in the apartment and that she would leave Kaylee in the apartment with someone else present and would smoke outside shortly before going to sleep. She would shower after smoking and then lie down to sleep with Kaylee. She admitted that she had continued using marihuana during the underlying proceeding, explaining that she thought it was better to control her depression and anxiety with marihuana rather than through prescribed medications because "I thought using marijuana was better than me walking slow, slurring my words, moving slow, on pills." Mother testified about the numerous visitations and doctor's appointments she had missed, blaming many of them on a lack of transportation. However, she admitted to using Department-issued bus passes for non-visitation purposes and said she was not willing to walk to the bus stop if it was raining. She also agreed that the

15

Department had made arrangements to drive her to and from some visits but that she sometimes did not give sufficient notice for the Department to arrange transportation. Mother testified that she had completed many of the requirements set out by a court order, but she did not comply with most of the requirements related to her drug use, such as ceasing her use of marihuana, working a twelve-step program, or finding a sponsor.

Grandmother and Mother's younger sister both disputed the testimony about the dirtiness of the apartment and the smell of marihuana smoke. They also denied Pillow's claims of a roach infestation and of people going in and out of the apartment or drinking and smoking in the apartment. Grandmother, Mother's sister, and other relatives testified that Mother understood Kaylee's medical issues and how to care for her and that Kaylee was never medically neglected before her removal from Mother's care. Patricia Luna provided daycare for Kaylee for one and one-half semesters until Kaylee's removal, and she testified that Kaylee was always well-dressed and groomed. She said that Mother was cautious and concerned about Kaylee's health, that she told the daycare "in detail" about Kaylee's medical conditions, and that she informed them about upcoming doctor's appointments. Luna testified that Mother always brought enough formula and was careful in labeling it so the daycare could tell which formula was for Kaylee.

The Department presented evidence of Kaylee's medical and developmental improvements while in the Pearsons' care and of her bonding with them. The Pearsons have expressed interest in adopting Kaylee if Mother's parental rights were terminated. Mother presented evidence that she had a stable place for her and Kaylee to live.

## Discussion

The trial court found clear and convincing evidence to support termination on grounds that Mother knowingly placed Kaylee or allowed her to remain in conditions that endangered her well-being, Tex. Fam. Code § 161.001(b)(1)(D), engaged in conduct or knowingly placed Kaylee with persons who engaged in conduct that endangered her well-being, *id.* § 161.001(b)(1)(E), failed to comply with a court order that set out the actions necessary for Mother to regain custody after removal due to abuse or neglect, *id.* § 161.001(b)(1)(O), and used marihuana in a manner that endangered Kaylee, *id.* § 161.001(b)(1)(P). Mother argues that the evidence is insufficient to support each statutory ground and the finding of best interest. We will consider first whether the evidence is legally and factually sufficient to support a finding under subsection (E), which provides that parental rights may be terminated if the parent "engaged in conduct . . . [that] endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E); *see Spurck v. Texas Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 221 (Tex. App.—Austin 2013, no pet.) ("Only one statutory ground is necessary to support a judgment in a parental-rights-termination case.").

A child is "endangered" if she is placed in jeopardy or exposed to loss or injury. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *R.F. v. Texas Dep't of Family & Protective Servs.*, No. 03-15-00697-CV, 2016 WL 1305911, at *5 (Tex. App.—Austin Mar. 31, 2016, no pet.) (mem. op.). A showing of endangerment requires "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," but the conduct need not be directed at the child, nor is it necessary that the child suffer an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *Boyd*, 727 S.W.2d at 533. "Endangerment may be satisfied by showing that a parent engaged in a 'course of conduct' that

endangered the child's physical or emotional well-being." *Vasquez v. Texas Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). In evaluating endangerment, we consider the child's environment before the Department took custody of the child. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "'Environment' refers to the acceptability of living conditions, as well as a parent's conduct in the home," and the child is endangered if "the environment creates a potential for danger that the parent is aware of but consciously disregards." *Id.*

There was conflicting evidence about whether Kaylee was gaining weight at an appropriate pace in the weeks before she was removed, but the experts agreed that she had "plateaued" in weight gain in the several months before her removal and that such a plateau was cause for concern. There was also agreement among the experts that the goal was for Kaylee to gain enough weight to undergo a liver transplant and that an NG-tube, as recommended by Kaylee's doctors in January and March 2017, would have been appropriate. There was evidence that Mother had missed at least two WIC appointments shortly before Kaylee's removal, and the experts agreed that it would be cause for concern if someone on Kaylee's medical team believed that Mother lacked a sufficient supply and had missed an opportunity to obtain more.

Although Mother disputed Pillow's testimony, Pillow testified that when she visited the family's apartment, it was cluttered and dirty and filled with people smoking and drinking.[4]  *See In re A.T.*, 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013, pet. denied) (unsanitary living conditions can rise to level of "surroundings that endanger a child"). Pillow

---

[4] Mother emphasizes the differing observations made and conclusions reached by Williamson and Pillow in their respective investigations. She also points to disputes between the testimony provided by Department's witnesses and her own. However, we must defer to the trial court's assessment of the witnesses' credibility and demeanor. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

and Dryer both testified that there was a smell of marihuana in the residence and in the room where Kaylee slept, and Mother and Grandmother admitted to regular marihuana use. *See R.F.*, 2016 WL 1305911, at \*5 ("evidence of regular and habitual use of illegal drugs may support termination because it subjects the child to the possibility that the parent may be impaired or imprisoned" (cleaned up)); *Zieger v. Texas Dep't of Family & Protective Servs.*, No. 03-03-00690-CV, 2005 WL 2043812, at \*3 (Tex. App.—Austin Aug. 25, 2005, pet. denied) (mem. op.) ("Illegal drug use in the child's household constitutes surroundings that endanger the well-being of the child under subsection D."); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage").

Further, "co-sleeping" has been considered a factor in assessing whether a child was subjected to a dangerous environment, and Mother continued to co-sleep with Kaylee despite having been warned by Williamson that it could be dangerous, particularly given Kaylee's small size. *See, e.g.*, *In re L.A.M.*, 545 S.W.3d 579, 581 (Tex. App.—El Paso 2016, no pet.); *In re N.K.T.*, No. 01-16-00439-CV, 2016 WL 6277415, at \*1 (Tex. App.—Houston [1st Dist.] Oct. 27, 2016, no pet.) (mem. op.); *In re M.H.*, No. 09-15-00084-CV, 2015 WL 4760115, at \*2 (Tex. App.—Beaumont Aug. 13, 2015, no pet.) (mem. op.); *In re A.J.E.M.-B.*, No. 14-14-00424-CV, 2014 WL 5795484, at \*16 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.); *A.T.*, 406 S.W.3d at 371. Compounding that general concern, Mother testified that she would smoke marihuana before going to bed and co-sleeping with Kaylee, which would heighten the risk of danger to the child. *See In re A.C.*, No. 02-18-00129-CV, 2018 WL 5273931, at \*5 (Tex. App.—Fort Worth Oct. 24, 2018, pet. denied) (mem. op.) (Department initiated investigation after receiving report that mother was co-sleeping with infant after

drinking alcohol); *see also In re N.W.L.T.*, No. 14-18-00497-CV, 2018 WL 6217313, at *2 (Tex. App.—Houston [14th Dist.] Nov. 29, 2018, pet. denied) (mem. op.) (Department sought termination after investigating death of six-month-old while co-sleeping with mother, who had been drinking earlier that night). Williamson testified that she closed the case after addressing the co-sleeping issue with Mother and that she would have had heightened concerns if she knew that another caseworker had explained the same dangers to Mother only months before.

Finally, several members of Kaylee's medical team had concerns about Mother's attentiveness to their instructions and understanding of the full range of Kaylee's needs, including her need for an NG-tube or transplant surgery. Mother did not learn to care for Kaylee's NG-tube, and when it snagged on Mother's hand during a visit, she cut the tube in a way that could have resulted in the need for surgical intervention.

This is a difficult case, as the trial court observed, and the evidence of any failures by Mother related to Kaylee's medical needs would not alone rise to the level of clear and convincing evidence of endangerment. *See Smith v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-02-00598-CV, 2003 WL 22096141, at *14 (Tex. App.—Austin Sept. 11, 2003, no pet.) (mem. op.). However, those concerns must be viewed in tandem with the evidence about Mother's regular marihuana use before Kaylee's removal; her continued use after Kaylee's removal, in violation of a court order; her failure to attend training on how to take care of Kaylee's NG-tube and her questionable response when it became dislodged; her missing a significant number of Kaylee's medical appointments and visitations after Kaylee's removal; the fact that Pillow witnessed the apartment full of people drinking and smoking; Mother's continuing to co-sleep with Kaylee after being warned of its dangers—particularly her

continuing to do so after smoking marihuana; and the dangers posed to Kaylee by the clutter and trash present in their bedroom.

As we have noted, the trial court, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses," *A.B.*, 437 S.W.3d at 503, and we are not in a position to reevaluate those determinations or to disregard the court's resolution of factual disputes that hinge on credibility and the weight that should be given to the witnesses' testimony, *In re A.M.*, No. 07-17-00094-CV, 2017 WL 4341543, at \*2 (Tex. App.—Amarillo Sept. 21, 2017, pet. denied) (mem. op.) ("We do not retry the case but, rather, assess whether the fact-finder could legitimately arrive at the conclusion it did. That requires us to afford deference to the fact-finder's authority to weigh witness credibility and resolve factual disputes."). On this record, we cannot say that a reasonable factfinder could not have formed a firm belief or conviction that Mother's conduct endangered Kaylee's physical well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E); *Smith*, 2003 WL 22096141, at \*14. We have no choice but to overrule Mother's first issue. Having found sufficient evidence to support a finding under subsection (E), we need not consider Mother's issues that relate to the other statutory grounds for termination. *See Spurck*, 396 S.W.3d at 221.

In Mother's fourth issue, she argues that the evidence is insufficient to support the trial court's finding that termination was in Kaylee's best interest.

We review the trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the child's wishes, if she is of an appropriate age to express them; her emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best

21

interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence presented to prove the statutory grounds for termination may also be probative of the best-interest determination. *Id.* at 28. The child's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs. *L.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the child might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the child's best interest. *See L.R.*, 2018 WL 3059959, at *1.

We have already discussed the evidence related to the risks Mother's conduct posed to Kaylee. The testimony established that Kaylee's foster family was providing her with a safe, nurturing environment and that they hoped to adopt her. Kaylee was too young to be able to express her wishes, but there was evidence that she is bonded both to Mother and to her foster family, with whom she had been placed upon her removal. *See M.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.) (factfinder may consider that child has bonded with current placement,

is well cared for by them, and has spent minimal time with parent). There was extensive evidence about Kaylee's significant medical needs and about her foster mother's efforts to manage them and stay organized. There was also evidence that members of Kaylee's medical team believed Mother did not have a full grasp of the challenges and the seriousness of Kaylee's conditions. Mother did not have Kaylee's prescriptions on hand when Pillow interviewed her, and she missed two WIC appointments to get Kaylee's prescription formula and had to get a case of samples to provide the necessary nutrition. After Kaylee's removal, Mother missed the majority of Kaylee's medical appointments, never got trained on the NG-tube, and reacted inappropriately when the tube became dislodged. *See LaRocca v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00103-CV, 2010 WL 4367065, at *8-9 (Tex. App.—Austin Nov. 4, 2010, no pet.) (mem. op.) (in suit for termination of parental rights to medically fragile child, court of appeals discussed evidence of child's needs and which proposed placement would best meet those needs).

The evidence showed that Kaylee's foster family was loving and supportive and had appropriate parenting skills. Mother was also appropriate and loving in her visitations with Kaylee and had completed a parenting class and participated in parent coaching. However, Mother missed numerous visitations and medical appointments and, although she testified that she mostly missed due to work or school conflicts, she admitted that she sometimes missed because she did not like riding the bus or because she did not want to walk to the bus stop in the rain. Grandmother and other members of Mother's family testified that they would support Mother in caring for Kaylee, but there was also evidence that Grandmother had completely deferred all Kaylee-related decisions to Mother, who was only seventeen at the time this proceeding began, as well as concerns that Mother lacked sufficient family support to properly

23

care for the child. Mother continued to smoke marihuana throughout the pendency of the proceeding, despite knowing she had been ordered to abstain. Mother also admitted that before Kaylee's removal and despite being warned of the danger, she had co-slept with the child after smoking marihuana, placing Kaylee at increased risk of injury.

Mother emphasizes the programs provided to Kaylee's foster family, such as a medical delivery service and an in-home nurse, and asserts that she presumably "would be entitled to the same assistance" if she regained custody of Kaylee. She also notes that she reached out for services from Any Baby Can and WIC. However, her Any Baby Can caseworker testified that Mother canceled or was a "no-show" for her appointments "a lot" and that "[i]t was a pretty consistent back and forth of canceling, no-showing and rescheduling." Mother also missed two WIC appointments, which led to Pillow's investigation, and did not complete several of her court-ordered services. Both Mother and Kaylee's foster parents explained that they had started thinking of how to care for Kaylee in the future and to ensure that Kaylee would learn to manage her own health as she got older.

Mother was very young when she had Kaylee and although she agrees in her briefing that "the foster family has greater stability than a single teenage mother," she had obtained an apartment several months before trial and had begun classes to become a medical assistant. However, at the time of the trial, Mother had stopped taking classes and said that she planned to stay home with Kaylee until she was five years, at which time Mother would return to school.

We hold that the evidence is legally and factually sufficient to support the trial court's finding that termination was in Kaylee's best interest. *See* Tex. Fam. Code § 161.001(b)(2). We overrule Mother's fourth issue on appeal.

24

## Conclusion

Having overruled Mother's issues on appeal, we affirm the trial court's decree terminating her parental rights to Kaylee.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed:   May 16, 2019