**Affirmed and Opinion Filed November 13, 2023**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-23-00487-CV

## IN THE INTEREST OF BABY GIRL H., ET AL., CHILDREN

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-21-00917-W**

## MEMORANDUM OPINION
Before Justices Partida-Kipness, Reichek, and Miskel
Opinion by Justice Miskel

The Department of Family and Protective Services (the Department) took

possession of twins Baby Girl H and Baby Boy H from the hospital a few weeks

after their preterm birth.[1]  After a bench trial, the trial court terminated the parental

rights of H.H. (Mother), the alleged father G.B., and any unknown father.

Mother appeals this judgment, arguing in the first part of her first issue that:

(1)(a) the Department abandoned its endangerment grounds for termination
prior to trial,

---

[1] To protect the identities of the minors, we have not used the actual names of Baby Girl H or Baby Boy H, their parents, or their mother's husband. *See* TEX.R.APP. P. 9.8.

and arguing in the second part of her first issue and her remaining issues that the evidence is not legally or factually sufficient to support termination:

(1)(b) on endangerment grounds,

(2) based on Mother's failure to comply with the terms of her court-ordered service plan,

(3) based on Mother's mental illness or deficiency, and

(4) as being in the best interest of the children.

For the reasons discussed below, we affirm the trial court's termination of Mother's parental rights under subsections (D) and (E) of Section 161.001(b)(1) of the Texas Family Code, including its finding that such termination is in the best interest of the children under Section 161.001(b)(2).  Because we affirm the termination on (D) and (E) endangerment grounds, we need not address Mother's second or third issues challenging the termination on (O) service plan grounds or Section 161.003 mental illness or deficiency grounds.

## I.    PROCEDURAL BACKGROUND

Mother gave birth to twins, Baby Girl H and Baby Boy H, on August 16, 2021. Three weeks later, after the mother had been sent to an inpatient psychiatric facility, the Department took possession of the children from the hospital pursuant to an ex parte emergency order and placed them in foster care.  In September 2021, the Department filed suit for the protection of the children, requesting conservatorship and termination under Section 161.001(b)(1)(D) and (E) of the Texas Family Code.

The Department was unable to locate Mother, and the parents were served by publication.

By October 2021, the Department had completed its investigation of the alleged abuse or neglect reported by the hospital in August, ruled out those allegations, and closed that investigation.

Mother was located in late March 2022, and the court re-appointed an attorney ad litem for Mother during a permanency hearing in May. In July 2022, Mother filed a general denial and counter-petition requesting to be named the managing conservator of the children. The next day, the Department filed an amended petition alleging additional grounds for parental termination. In September, Mother requested and received an extension of the statutory dismissal date to March 11, 2023.

On March 6, 2023, the case was called to trial by the trial court and then recessed until April 26, 2023. At the conclusion of the bench trial on that date, the trial court found that termination was in the children's best interest and terminated Mother's parental rights to Baby Girl H and Baby Boy H pursuant to Section 161.001(b)(1) (D), (E), and (O) and Section 161.003 of the Texas Family Code. The trial court also terminated the parental rights of the alleged and unknown fathers and appointed the Department as permanent managing conservator. The trial judge

signed the decree of termination on May 8, 2023.[2] Mother appeals the termination decree.

## II. FACTUAL BACKGROUND

### A. Mother's Medical, Mental Health, and Substance Abuse History

Mother was 33 years old at the time of trial with a ten-year documented history of mental illness. She has been diagnosed with schizoaffective disorder, bipolar disorder, and depression. Mother has an inconsistent history of managing her mental health and complying with her prescribed medication. Mother also has attempted suicide or had suicidal ideations several times in her life. Mother has been hospitalized numerous times since 2013 and has reported hearing voices, experiencing visual hallucinations, having suicidal thoughts and feeling depressed. In the two months before becoming pregnant with the twins, Mother was admitted to inpatient mental health treatment multiple times.

Mother was diagnosed with ADHD when she was fourteen years old and attended special education classes in school. She has scoliosis, which causes her to move slowly, but she is able to cook and clean her home. At the time of trial, Mother also had begun suffering from tardive dyskinesia, a condition that causes involuntary movements of the body and mouth. She cannot lift heavy objects, and her medications sometimes cause stiffness in her body.

---

[2] The decree of termination does not address termination pursuant to §161.001(b)(1)(N), one of the grounds added by the Department in its amended petition. We construe the decree of termination as impliedly denying termination of Mother's parental rights on this ground.

–4–

Mother testified that she is in the process of applying for disability benefits. She has lived with her parents most of her life with periodic bouts of homelessness until she moved in with her fiancé, Nathan, after the birth of the twins. Her father also suffers from schizophrenia, her mother has been blind for several years, and both have mental delays.

The record indicates that Mother has a history of intermittent cocaine and marijuana use. In August 2019, Mother was found running naked in traffic and was admitted to the hospital. On admission she displayed other "bizarre" behavior such as urinating on herself, smearing feces on the walls, and behaving in a hypersexual and aggressive manner. She tested positive for cocaine, which the hospital report stated likely contributed to her acute behavior. Mother also tested positive for cocaine in November 2020, the month before becoming pregnant with the twins. In December 2020, Mother self-reported that she had used cocaine about twice a month since she was 21 years old.

B.     **Mother's Child Welfare and Legal History**

Mother has a history of involvement with the Department. In July 2019, Mother went into labor with her first child. Mother disregarded the instructions of hospital staff and gave birth to the baby in the hospital restroom. The baby was admitted to the neonatal intensive care unit (NICU) due to respiratory problems. Mother and her parents were living in a single room of a boarding house at the time and had not made preparations for the baby. The Department took custody of the

baby directly from the hospital. Mother's parental rights were terminated on endangerment grounds, and that child was later adopted.

In September 2019, Mother was arrested and charged with theft and later also charged with harassing a public servant. After several months in jail, she was found incompetent to stand trial and committed to an inpatient mental health facility. Her competency was restored in August 2020, and she returned to jail until her release in October 2020. In February 2021, during her pregnancy with the twins, Mother was again found incompetent to stand trial on the second charge, and that criminal case was dismissed. Mother has been arrested four times for misdemeanor theft, once for criminal trespass, and once for harassment of a public servant. Mother spent time in jail relating to these cases; however, all cases were dismissed, and Mother has no criminal convictions.

### C. Mother's Medical History During Pregnancy and the Child Welfare Case

In December 2020, Mother returned to Metrocare to begin taking her medications again. Mother became pregnant with the twins around this time. She obtained limited prenatal care, mostly while she was in jail or in the hospital. She testified that she stopped taking her medications because "the doctor had told me it's not good." Mother attempted suicide or had suicidal ideations while in jail in March 2021 during her pregnancy with the twins and also in December 2021 after the twins' birth.

Mother self-reported that she had used cocaine and marijuana in April 2021, while she was pregnant with the twins. A hospital psychiatry discharge summary from that month noted Mother's statement that she uses "recreational drugs, most notably marijuana, K2, crack cocaine, and 'embalming fluid.'" However, at trial, Mother denied ever having used any substances other than cigarettes.

In August 2021, Mother came to the hospital with chest pain. She was diagnosed with a pulmonary embolism and remained in the hospital until the twins were born about two weeks later. While at the hospital, Mother resisted fetal monitoring because the pressure of the equipment caused her pain, although she did permit the nurses to monitor the babies for very short periods. She also refused to take medications because she was concerned it would harm the babies. However, Mother did begin to take medication to treat the pulmonary embolism after her initial refusal and also began taking medications to manage her mental health after the birth of the twins.

During her time at the hospital, nurses and doctors reported that Mother behaved in a childlike, dependent manner and needed guidance for basic tasks. Hospital personnel estimated that her mental capacity was that of a ten-year-old child and were concerned about her ability to care for the twins due to her untreated mental health issues and limited cognitive skills. At that time, Mother lived in a hotel with her parents and slept on the floor. The hospital reported these concerns to the Department.

The twins were born at about 36 weeks and were admitted to the NICU due to their low birth weights and respiratory issues. A few days later, the hospital transferred Mother to a mental health facility, where she stayed for a month. When the twins were to be discharged from the hospital, the Department took conservatorship and placed them in foster care. The Department considered placement of the children with Mother's parents or sister but was unable to locate a suitable family member.

Mother was discharged from inpatient psychiatric treatment in September and began living with Nathan. She testified that she got back together with Nathan before the twins were born. She planned for the twins to live with them and to be a family together. Mother and Nathan married the day before the trial in this case. Nathan was sixty-six years old at that time and on parole after serving thirty-five years of a life sentence for murder and aggravated robbery. In the year before trial, Mother and Nathan lived in a room in a boarding house that had common living areas and a communal bathroom down the hall. Nathan's disability payments provided their financial support. Mother testified that she had met with someone to discuss obtaining WIC and food stamp benefits but is unable to apply for them until she has custody of the children.

In October 2021, Mother suffered from severe postpartum depression and asked to be taken to the hospital because she felt her medication was not working.

According to records, she had engaged in a suicide attempt in which Nathan had to wrestle a knife from her hands. She was hospitalized for two weeks.

In December 2021, Mother and Nathan had an argument in which he raised his voice and scared Mother who began to have suicidal thoughts. She checked herself back into the hospital for about a week. In January of 2022, she returned to the hospital for two days when she thought Nathan was angry at her. A case manager later advised her to use coping skills rather than running to the hospital during every perceived crisis. All together, Mother had four mental health hospitalizations in the five months following the twins' birth.

In January 2022, Mother began a year-long intensive counseling program at Metrocare in which she received medication, attended weekly counseling sessions, attended sessions with a psychiatrist (initially weekly and later monthly), and had weekly bloodwork completed to help manage her medications. Mother said she missed her bloodwork appointments on occasion if she failed to arrive on time due to issues with public transportation. She also completed homework and met with a case manager weekly.

At the time of trial in March 2023, Mother had been receiving counseling services and medications from Metrocare for sixteen months and had no further hospitalizations. She testified that she did not know the names of all seven of her medications and that some of them caused drowsiness and stiffness in her body. A nurse divides her medications into days of the week boxes for Mother. Mother

acknowledged at trial that she plans to continue to go to Metrocare in the future as part of her normal schedule, possibly every two weeks, because she needs her medication and therapy to get better. She testified that she is getting better, is functioning better, and is not depressed. She also acknowledged that she needs the support of Metrocare and Nathan in her life and would need Nathan's help to take care of the children as they get older. One example she provided was that she would need help when they were out walking to prevent the children from running in the streets. Nathan goes with Mother to all her visits and appointments, helps make sure she takes her medication, and is an emotional support for Mother.

A licensed professional counselor from Metrocare who had worked with Mother testified that she had made progress in interpersonal areas but should continue to work on becoming more interactive, open, and social. The counselor agreed that she anticipates working with Mother for some time in the future.

### D.     Mother's Participation in the Child Welfare Case

Mother did not initiate any contact with the children or with the Department from the time of the newborn twins' removal in September of 2021 until March of 2022. Mother testified that she did not contact the Department to locate her children because she did not know how to reach them. Mother testified that "[t]he hospitals had me overmedicated" and "[i]t was like, where I could not do anything." She said that this changed when she began going to Metrocare in January 2022, and the

psychiatrist there changed her medications. In March 2022, the case manager called Mother's grandmother, and Mother called the Department back that same day.

According to testimony from both Mother and her Department case manager, Mother first received a copy of her family services plan in July 2022. During the pendency of the case, Mother had one positive drug test for marijuana in September 2022 but otherwise tested negative for illegal substances during her court-ordered family service plan.

Mother also began and completed parenting classes. When asked about her parenting knowledge and plans at trial, Mother testified that "children need love, protection, support" and "clothes, shoes, food." Mother stated that she, Nathan, and the twins would live in their room in the boarding house. When asked where the twins would sleep, Mother said that they would sleep in her bed and that she would sleep in a small bed. Her testimony did not clarify where Nathan would sleep.

During the trial, Mother testified that she had some stuffed bears for the children but had not yet purchased any clothes, food, diapers or other supplies at the time of the twins' birth or at the time of trial. She acknowledged that she knew where to buy diapers and clothes and could do that once she knew their sizes.

When asked for an example of her parenting plans for a day, she testified that she planned to make sure they eat and let them watch cartoons. When asked what her plan would be for the children if she were to go to the hospital again, Mother responded that she did not plan on going to the hospital again. She testified that she

needed to take her medication and continue going to Metrocare to avoid ending up in the hospital.

As a result of various scheduling delays and a possible lack of diligence, Mother began to have supervised visitation with the twins beginning in late July 2022.[3] Nathan initially attended visits with her but, after six months, he was no longer allowed to be present due to his criminal history. The visitation supervisor testified that Mother consistently appeared for visitation and had a good attitude but reported that she did not observe Mother interacting much with the children or showing physical affection often. Mother mostly sat in the room watching the children while they played with toys. She did not often play with them or read or sing to them. The supervisor stated that Mother often was texting on her phone and not adequately focused on the children in the visitation room. The supervisor expressed concern that the children might get into things in a home environment without Mother realizing it. The supervisor later agreed that Mother appeared to love her children, but it did not appear as if there had been much bonding by the children.

During these visits, the supervisor would observe that Mother was not preparing the bottles properly and help her, but then Mother would have trouble

---

[3] Mother's testimony on the timing of her call to the Department and initial visit with her children is inconsistent, and the State's brief cites September or October 2022 as the regular visit start date. Based on the record, it appears that visits were intermittent until September or October and then began on a regular basis.

remembering how to properly prepare the bottles the following week. The supervisor also had to prompt Mother to change the children's diapers and help with food and sippy cups as they got older. The supervisor confirmed that Mother was responsive to this help and redirection. Later, she also acknowledged that, in the few months prior to trial, Mother had made an effort to change the children's diapers without being told. The supervisor also testified that during the earlier visits that Nathan attended, he would support Mother and prompt Mother to make a bottle, change a diaper, or feed the children. They would take photos of the twins. Mother usually did not bring juice, food or toys to the visit. The supervisor confirmed that the daycare also sometimes forgot to include drinks and snacks in the children's diaper bag but that most parents brought these items for their children.

Mother was evaluated by a clinical psychologist in November 2022, five months prior to trial. Mother scored below average in four of five different areas on the parenting questionnaire. Mother scored in the low average to average range on a brief intelligence test. The psychologist testified that Mother's understanding of her mental health challenges seemed impaired.

At trial, the psychologist testified that Mother provided a general summary of her mental health history but was unwilling or unable to provide historical details of her symptoms and hospitalizations. For example, the psychologist was not aware that Mother had been participating in the Metrocare program for 16 months. The psychologist testified that inaccurate information could impact her

recommendations or opinion. Mother did acknowledge that she had an extensive history of symptoms but minimized her mood difficulties.

When asked if there was anything about Mother's IQ that would prevent her from parenting her children, the psychologist replied, "No." When asked if Mother suffers from a permanent cognitive deficiency that renders her unable to provide for her children, the psychologist also responded, "No." The psychologist declined to give an opinion as to Mother's ability to parent her children.

Both the Department's case manager and the children's guardian ad litem recommended that the court terminate Mother's parental rights based on concerns about her ability to parent the children and take care of their needs due to her significant mental challenges and inability to function independently. The Department remained concerned that, despite her participation in the family services plan, Mother still lacked the mental and physical ability to adequately ensure the safety of the children. The case manager ultimately agreed, "Even on her best day, mom's not capable of effectively taking care of these twins." At the end of the trial, the court found that termination was in the best interest of the children and terminated Mother's parental rights under Section 161.001(b)(1) (D), (E), and (O), and Section 161.003.

## III.    STANDARD OF REVIEW

A parent has a fundamental constitutional right to the care, custody, and control of her child. *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022). As a result, the

State must meet a clear-and-convincing burden of proof at trial for a court to terminate that right. *Id.*; TEX. FAM. CODE §161.001(b). Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE §101.007.

However, "[w]hile parental rights are of a constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018) (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

Our standards of review reflect the elevated burden of proof at trial. *In re T.J.*, No. 05-22-00954-CV, 2023 WL 1988838, at *2 (Tex. App.—Dallas Feb. 14, 2023, no pet.) (mem. op.). Under both legal-sufficiency and factual-sufficiency standards, we consider all the evidence, defer to the factfinder's determinations as to witness credibility, and determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *Id.*; *see also In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (describing the factfinder as "the sole arbiter when assessing the credibility and demeanor of witnesses"). The distinction between legal-sufficiency review and factual-sufficiency review "lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d

–15–

at 630; *In re C.B.*, No. 05-20-00699-CV, 2021 WL 164445, at \*8 (Tex. App.—Dallas Jan. 15, 2021, no pet.) (mem. op.).

In reviewing a challenge to the legal sufficiency of the evidence supporting a termination of parental rights, the court must view all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *In re J.W.*, 645 S.W.3d at 741. However, the court may not disregard "undisputed facts that do not support the finding." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266) (Tex. 2002)). Even evidence that does more than raise surmise and suspicion will not suffice as clear and convincing unless it can produce a firm belief or conviction that the allegation is true. *In re T.J.*, 2023 WL 1988838, at \*2. If no reasonable factfinder could form a firm belief or conviction that the allegation is true, the evidence is legally insufficient. *Id.*

In reviewing a challenge to the factual sufficiency of the evidence, we must weigh disputed evidence contrary to the finding against all the evidence supporting the finding. *In re A.C.*, 560 S.W.3d at 631; *In re T.J.*, 2023 WL 1988838, at \*2. In other words, evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d at 630.

## IV. THE DEPARTMENT DID NOT ABANDON ENDANGERMENT GROUNDS FOR TERMINATION

This case originated when Mother entered the hospital with chest pain two weeks prior to the birth of the twins. Hospital doctors and nurses were concerned by Mother's resistance to treatment, limited willingness to permit fetal monitoring, her childlike behavior, and her lack of awareness about her situation. The hospital reported their concerns to the Department, which resulted in an investigation for neglectful supervision and the emergency removal of the twins from Mother's custody. However, a disposition letter dated October 11, 2022, to Mother from the Department indicated that the neglectful supervision concerns reported by the hospital had been "ruled out." This finding indicated that, "based on the available information, it was reasonable to conclude that the alleged abuse or neglect did not occur."

Mother argues that the Department constructively abandoned all claims for termination under grounds (D) and (E) as a result of this letter. However, Mother fails to cite legal authority for this argument. Ruling out a claim for neglectful supervision during the mother's hospitalization did not preclude additional action by the Department upon further review of the circumstances of Mother's subsequent actions or prior history. Moreover, the letter from the Department stated the following:

> Please be aware that this letter applies only to the closure of your investigation case. We have offered services to your family to address safety and risk concerns identified during the investigation. Your

family may continue to be involved with [the Department] and assigned an ongoing services caseworker through the Family Based Safety Services or Conservatorship Program.

. . .

**NOTE: THE FACT THAT YOUR ROLE AS AN ALLEGED PERPETRATOR IN THIS <u>PARTICULAR</u> INVESTIGATION HAS BEEN RULED OUT . . . DOES NOT PRECLUDE FURTHER INVOLVEMENT WITH YOUR FAMILY BY [THE DEPARTMENT], INCLUDING THE PROVISION OF SERVICES, COURT INVOLVEMENT, OR EVEN TERMINATION OF PARENTAL RIGHTS.**

We disagree with Mother's argument that, by ruling out the August 17, 2021, allegations, the Department was precluded from pursuing its case for termination of parental rights under endangerment or other grounds set forth in the Texas Family Code.

## V. THE EVIDENCE IS LEGALLY AND FACTUALLY SUFFICIENT TO SUPPORT TERMINATION ON (D) AND (E) GROUNDS

Mother argues that the trial court erred in terminating Mother's parental rights under Section 161.001 because the Department's evidence was legally and factually insufficient to demonstrate that Mother endangered her children under subsections (D) or (E) or that termination of Mother's parental rights was in the children's best interests. TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), (b)(2).

### A. Applicable Law

A court may terminate a parent-child relationship under the Texas Family Code if the court finds by clear and convincing evidence that the parent has committed one of the twenty-one predicate acts in Section 161.001(b)(1), and that

termination is in the best interests of the child. TEX. FAM. CODE §161.001(b). In the present case, the Department pleaded that Mother committed several predicate acts under Section 161.001(b)(1), including that she:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

TEX. FAM. CODE §161.001(b)(1)(D), (E).

**B.    The Evidence Establishing the Predicate Acts Under Subsections (D) and (E) Was Sufficient**

Mother argues that the Department failed to establish by clear and convincing evidence that she endangered her children under subsections (D) and (E) of Section 161.001(b)(1) of the Texas Family Code.

### 1.    *Applicable Law*

The predicate grounds set forth in subsections (D) and (E) are called the "endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. The Texas Supreme Court has stated that "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it does not require that there be conduct directed at the child or that the child actually suffer injury. *Id.* "Endangerment includes actions that expose the child to loss or injury or jeopardize the child's emotional or physical health." *In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied) (quoting *Tex. Dept. of Human Servs. v. Boyd*, 727

–19–

S.W.2d 531, 533 (Tex. 1987)). Under both subsections, a trial court may consider endangering conduct that occurred before and after the child's birth and conduct that occurred in and out of the child's presence. *In re T.J.*, 2023 WL 1988838, at *2.

The relevant time frame for evaluating subsection (D) is before the child's removal because "conditions or surroundings cannot endanger a child unless that child is exposed to them." *In re J.W.*, 645 S.W.3d at 749. The Texas Supreme Court has acknowledged that "typically, a parent whose child has been removed and who has only supervised visitation has no control over the child's environment, and the parent's conduct during that time will thus be unrelated to Subsection (D)." *Id.* at 749 n.12. Moreover, "evidence that a parent will knowingly expose the child to a dangerous environment in the future, while relevant to a best-interest determination, is not proof that the parent has knowingly exposed the child to a dangerous environment in the past for [s]ubsection (D) purposes." *Id.* at 749.

With respect to subsection (E), the endangerment must be caused by the parent's conduct as evidenced by the parent's acts and omissions. *In re C.M.B.*, 204 S.W.3d at 895. Termination under subsection (E) must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). We consider conduct both before and after a child's removal from the parents for subsection (E) purposes. *See In re T.J.*, 2023 WL 1988838, at *2 (citing

–20–

*In re R.B.*, No. 05-21-00043-CV, 2021 WL 2943927, at *8-9 (Tex. App.—Dallas July 9, 2021, no pet.) (mem. op.)).

Although a reviewing court need uphold only one termination ground to affirm a termination judgment on appeal, due process mandates appellate review of terminations under subsection (D) or (E) because those grounds can affect a parent's rights to other children. *See In re N.G.*, 577 S.W.3d 230, 232, 237 (Tex. 2019) (per curiam). We will conduct a consolidated review of the evidence pertaining to subsections (D) and (E) because the evidence is interrelated. *See In re A.T.*, 406 S.W.3d at 371.

### 2. *The Evidence Was Sufficient to Establish Endangerment*

Mother argues that the Department's concerns about the children's safety if placed with Mother and Mother's need for support to parent the children do not constitute grounds for termination of her parental rights. We disagree to the extent that Mother's actions jeopardized her children's emotional or physical health. *See In re C.M.B.*, 204 S.W.3d at 895 (citing *Tex. Dept. of Human Servs. v. Boyd*, 727 S.W.2d at 533). Evidence of endangerment appears in the record, including Mother's alleged drug use, multiple hospitalizations for attempted suicide or suicidal ideation, resistance to treatment, and lack of effort to locate her children while knowing they were in the Department's custody.

Mother became pregnant with the twins around December of 2020. Although at trial Mother denied ever using drugs, the Department introduced records from

–21–

December 2020 in which Mother reported that she had used cocaine one week prior and that she had used cocaine and marijuana regularly since age 21. Another record showed that in April 2021, while Mother was pregnant with the twins, Mother self-reported using crack cocaine and marijuana. The psychiatric discharge summary from her hospitalization during that same month diagnosed the pregnant Mother with a cocaine use disorder, a cannabis use disorder, an alcohol use disorder and a tobacco use disorder. It further provides that Mother "does state that she regularly uses recreational drugs, most notably marijuana, K2, crack cocaine and 'embalming fluid.'"

Mother testified that she disagreed with certain records indicating she used cocaine. However, evidence from other records contradicts her testimony. We must assume that the trial court resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *See In re J.W.*, 645 S.W.3d at 741. Based on the record in this case, a reasonable factfinder could have resolved the disputed facts related to Mother's drug use by finding that the evidence showed that she used drugs while pregnant and that this use endangered her children under subsections (D) and (E). *See id.* at 749 (stating that "[c]ertainly, *Mother's* use of controlled substances while pregnant created a dangerous environment for [her baby]…."); *see also In re C.J.B.*, No. 05-19-00165, 2019 WL 3940987 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.) (stating that a mother's use of drugs during pregnancy may amount to conduct that endangers the physical or emotional well-being of the child).

The Department's case manager did testify that, aside from one positive test for marijuana, Mother did not have any positive drug test results during the time she participated in her service plan. However, this does not negate the evidence about Mother's acts and omissions that gave rise to the removal and termination.

Mother's conduct leading to her multiple inpatient psychiatric hospitalizations, both while pregnant and after the birth of her children, provides further evidence of endangerment. Mental illness or incompetence of a parent alone are not grounds for terminating the parent-child relationship. *In re C.M.B.*, 204 S.W.3d at 895. That said, "if a parent's mental state causes her to engage in conduct that endangers the physical or emotional well-being of a child, that conduct can be considered in a termination proceeding." *Id.*; *see also In re J.P.*, No. 02-07-00026-CV, 2008 WL 283295 (Tex. App.—Fort Worth Feb. 4, 2008, no pet.) (mem. op.). Courts have stated that "[t]hreats or attempts to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that is detrimental to a child's physical or emotional well-being." *In re J.P.*, 2008 WL 283295, at *6.

The record demonstrates that Mother has had at least twenty psychiatric hospital admissions prior to the children's birth, including several while she was pregnant. During her pregnancy in March 2021, Mother attempted suicide while in jail, and in April 2021 the police brought Mother to the hospital for suicidal ideation and aggressive behavior. Mother was also re-admitted to the hospital four times in the five months after the birth of the twins, including admissions for suicidal

–23–

thoughts as well as for problems in her relationship with Nathan. In one episode, Nathan had to wrestle a knife from her hand. The trial court could have found that these acts would have endangered the physical health and emotional development of infant twins if placed in Mother's care.

Mother obtained limited prenatal care, often only while in jail or hospitalized, which the factfinder could have concluded endangered her children. When Mother came to the hospital with chest pain just prior to the children's birth, her childlike behavior and resistance to fetal monitoring at the hospital further demonstrated deficiencies in her judgment and ability to parent her children that subjected the twins to endangerment. Mother's initial refusal to take medication to treat the blood clots in her lungs could also have indicated to the factfinder an inability to take care of herself and a lack of self-awareness.

Based on the record in this case and the applicable standards of review for legal and factual sufficiency, we conclude that the trial court reasonably could have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children and that she engaged in conduct which endangered the physical and emotional well-being of the children. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). We overrule Mother's first issue.

**C.  The Evidence Was Sufficient to Conclude that Termination was in the Children's Best Interest**

Mother argues that the Department has failed to establish by clear and convincing evidence that termination was in the children's best interest.

**1.  *Applicable Law***

Even if a predicate act has been proved, termination of parental rights requires a finding that termination is in the best interest of the child. TEX. FAM. CODE §§ 161.001(b)(2), 161.003(a)(5). There is a strong presumption that a child's best interest is served by maintaining the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE ANN. § 153.131(b)). However, the prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

Satisfaction of the best-interest prong "is child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d at 746. The focus is on the best interest of the child, not the best interest of the parent; however, parental rights may not be terminated merely because a child might be better off living elsewhere. *In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.).

Several non-exclusive factors guide this best-interest determination, including: (1) the desires of the child; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in

the future; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best interest; (6) the plans for the child by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent–child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re J.W.*, 645 S.W.3d at 746 (citing *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976)).

This list is not exclusive, and the Department need not prove all the factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In addition, the same evidence can be relevant to both Section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied). This Court also has held that "'lack of education, training, or misfortune' falls within the final category of factors enumerated in *Holley*, excuses for the acts or omissions of the parent, and thus is one factor to be considered by the trier of fact in determining the best interest of the child." *In re S.H.A.*, 728 S.W.2d 73, 89–90 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

### 2. *Termination is in the children's best interest based on the Holley factors.*

An analysis of the *Holley* factors in this case supports the trial court's finding that termination of Mother's parental rights was in the best interest of the children.

Baby Girl H and Baby Boy H were approximately twenty months old at the time of trial and not old enough to express their desires.

The record contains significant evidence regarding Mother's inability to meet her children's emotional and physical needs. Although Mother loves her children, she has difficulty being affectionate towards them and they have not particularly bonded with her. She does not seem to understand how to engage with her children and does not actively play with them during supervised visits. The evidence establishes that Mother has a low to average IQ and has difficulty understanding basic matters without Nathan's assistance. Mother claimed that she could parent the children while they were younger but agreed that she would need help to parent the children once they were older. However, even her ability to parent young children without very significant support was disputed. She struggled to proactively address the children's bottle and diaper needs during her supervised visitations. Her inattention and lack of awareness carried significant risks that the toddlers could get into physically dangerous situations. Further, she suggested she would need help to prevent the children from running in the streets.

Mother did not attempt to contact the Department for seven months after the newborns' removal. Despite her prior history with the Department, she stated she did not know how to contact the Department, and she made no other efforts to locate the infants. Even assuming that the Department's caseworker could have been more

diligent in locating Mother, this demonstrates a lack of initiative, motivation, and judgment that impact Mother's parenting abilities and the children's welfare.

Mother's lengthy history of mental health hospitalizations demonstrates serious problems with the stability of her home environment and her capacity to meet the children's emotional and physical needs. Her history of suicidal thoughts and attempts, aggressive behavior, depression and possibly psychotic episodes in which she experiences auditory or visual hallucinations cause conditions which would endanger a child. Several of her hospitalizations in the months after the children's birth related to suicide attempts or thoughts of suicide. Her pattern of going on and off medication has caused lapses in her mental functioning, which creates emotional and physical dangers for the children. Mother was unable to name her own medications and was dependent on others to portion them out and ensure that she takes them. It is likely she would be unable to organize and administer any medication needed by the children. Although Mother has recently been able to maintain stability in her own medication compliance, her history indicates that this situation remains tenuous. When discussing her mental health treatment and goals, she testified that she "could not do it" without the help of Metrocare and Nathan.

In addition, Mother's drug and alcohol use before and during her pregnancy remains a significant issue. Mother has repeatedly denied she has ever used drugs despite evidence to the contrary. Mother participated in random drug tests in the six months before trial with only one positive test for marijuana. However, she

continues to drink beer several times per week, telling the psychologist "that she usually gets buzzed, and she sometimes experiences the room spinning and/or she vomits." This creates risks for parenting toddlers, especially when combined with her seven medications and her mental health diagnoses.

With respect to Mother's parenting abilities, four out of five of Mother's scores on her parenting attitude assessment were in the below average range. The psychologist indicated that mothers with scores in these ranges tend to have little self-awareness and difficulty handling parenting stressors. The Department expressed concern that, even with the assistance of the service plan, Mother was not able to provide the children with a safe environment. The Department argued that, although Mother completed her parenting classes and counseling, the deficiencies in her abilities to interact with the children or function independently were not resolved. The Department case manager testified that, even given additional time and resources, she did not believe that Mother would ever be able to function independently.

Pretrial reports indicated that the children were thriving in their foster placement, and the foster parents hoped to adopt them. The case manager also testified that the children would likely stay with the current foster placement and that the permanency plan of the department is for the children to be adopted.

On the other hand, Mother's plan to raise the children in the single room at the boarding home jeopardizes the children because Mother has not confirmed that

the children would be allowed to live there or acquired any of the items that would be needed to care for toddlers there.

The record contains significant evidence that various third party witnesses and professionals are concerned about the safety of the children if returned to Mother based on her limited capacities and parenting skills. Hospital personnel at the time of the children's birth reported that Mother had the mental capacity of a ten-year-old child. Mother has physical and learning disabilities, cannot work, and believes she qualifies as disabled. She has never lived on her own and depends heavily on Nathan's support to function on a daily basis. He takes her most places and supports her financially through his own disability checks, although Mother plans to apply for disability and would apply for WIC benefits and food stamps if the children were returned to her.

The psychologist who performed a one-time evaluation of Mother, based largely on Mother's self-reported information, did not form an opinion as to whether Mother's parental rights to her children should be terminated. The psychologist agreed that Mother's mental health issues would be a lifelong challenge, but when asked whether Mother suffers from a permanent cognitive deficiency that renders her unable to provide for her children, she answered, "No." However, the psychologist's trial testimony also revealed that Mother did not disclose complete information about her substance abuse and mental health history. The psychologist stated that this made it difficult for her to assess Mother's ability to cope and make

the changes that she needed to make. The psychologist agreed that the additional information about Mother's history of drug use and her family's psychiatric history could have impacted her recommendations.

The record indicates that Mother had made some progress with her therapy goals and had achieved relative stability in the year or so prior to trial with the careful management and support of Metrocare and Nathan. Yet, in light of Mother's mental challenges and inability to take care of herself independently, the children's guardian ad litem testified that he did not see any alternative to recommending the termination that he felt would be in the best interest of the children.

In analyzing the legal sufficiency of the evidence, we assume the trial court, as factfinder, resolved disputed facts in favor of its finding for termination of parental rights because a reasonable factfinder could do so in this case. In analyzing the factual sufficiency of the evidence, we do not find the disputed evidence to be so significant that the trial court could not have formed a firm belief or conviction in favor of termination of parental rights. Considering the evidence under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights was in the best interests of Baby Girl H and Baby Boy H. We overrule Mother's fourth issue.

## VI. CONCLUSION

Based on our conclusions regarding the termination of Mother's parental rights under Section 161.001(B)(1)(D) and (E) endangerment grounds, we need not address Mother's second or third issues regarding the trial court's termination under Section 161.001(b)(1)(O) or Section 161.003 grounds, which could not lead to a different result.

We conclude that the trial court reasonably could have formed a firm belief or conviction that Mother endangered Baby Girl H and Baby Boy H under subsections (D) and (E) and that termination of Mother's parental rights was in the children's best interests. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (b)(2). We affirm the trial court's judgment.

230487f.p05

/Emily Miskel/
EMILY MISKEL
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF BABY
GIRL H., ET AL, CHILDREN

No. 05-23-00487-CV

On Appeal from the 304th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. JC-21-00917-
W.
Opinion delivered by Justice Miskel.
Justices Partida-Kipness and Reichek
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 13th day of November, 2023.