**AFFIRM; and Opinion Filed July 10, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-13-00497-CV**

**IN THE INTEREST OF A.T., A CHILD, Appellant**

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 12-00305-W**

**OPINION**

Before Justices Moseley, O'Neill, and Lewis
Opinion by Justice O'Neill

Mother and Father appeal the trial court's judgment terminating their parental rights to A.T. Both parents argue the evidence is factually insufficient to support the trial court's finding (1) they knowingly placed or allowed A.T. to remain in conditions or surroundings that endangered the physical or emotional well-being of A.T. or (2) they engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of A.T. They further argue the evidence is factually insufficient to support a finding that termination of parental rights is in A.T.'s best interest. We affirm the trial court's judgment.

**Background**

Father and Mother have three children together. Two of their children live in Joplin, Missouri and are in the care of someone else. A.T. was born February 28, 2012.

On March 13, 2012, CPS received a referral regarding neglectful supervision of A.T. due to conditions at a hotel room. Sonya Garza, a CPS investigator, went to the hotel room and took officers from the Irving police department because she received information Mother and Father could become violent. After knocking on the door and explaining to Mother and Father why she was there, Garza said they became belligerent.

When Garza entered the hotel room, she immediately noticed the room was in disarray. She described it as "filthy, trash on the floor, you got clothes mixed in with dirty clothes, feces." Father admitted at trial they had two dogs and a cat living in the hotel room, but he and Mother denied the presence of any animal feces. Garza testified animal feces were present in the room, and the room had a "very bad odor." In addition to the smell of feces, she said she could smell mold. Both parents testified an overflowing toilet cased the odor in the room, and they claimed maintenance knew about the situation.

Father also admitted to the presence of loose tobacco in the room because they "rolled their own cigarettes." Garza observed cigarette butts on a table and on the floor.

Garza did not observe a crib for A.T. or any other baby supplies. When an officer asked Mother what she was feeding A.T., Mother produced a can of milk.

Mother and Father initially refused to talk with Garza in the hotel room. When they finally agreed, Garza noticed they "had extremely bad body odor." Their teeth were "extremely dirty, filthy with yellow stain, film." When Garza asked why the room was in such disarray, Mother said it was because she had given birth two weeks earlier. She later testified they planned to clean the room right after they got up that morning, but CPS and the police arrived and woke them up before they had a chance to clean. Garza testified she did not see any cleaning products in the room.

Garza testified the environment was a danger to A.T. because the room was "completely filthy" . . . "just deplorable conditions." She admitted, however, that when she saw A.T., he was not underweight and did not have any bites or bruises on him. Further, she did not observe any feces on A.T. or on the bed where he slept with his parents.

Pedro Lopez, another CPS worker, set up services for Mother and Father. He also supervised the majority of Mother and Father's visits with A.T. He testified they exhibited "extremely poor hygiene" to the point other coworkers complained about the odor they left behind in a room. Lopez said he started putting Carmex underneath his nose to suppress some of the smell. While he could not identify the odor with certainty, he said it was possibly some type of animal urine. Lopez admitted he never spoke directly to Mother and Father about their body odor.

He did, however, discuss them smelling of smoke. A.T. suffered from a constant upper-respiratory infection, and CPS believed the exposure to smoke was negatively affecting A.T.'s breathing. Lopez described a time when the daycare had to bathe A.T. upon his return from a visit with his parents because he smelled of smoke and "came back so filthy." He also noted three occasions when the parents smoked cigarettes outside before coming in for their visit with A.T.

Lopez agreed Mother and Father interacted appropriately with A.T. during their visits. However, he also testified they canceled at least ten visits and had been late to at least seven. He further observed a few occasions when Mother incorrectly mixed A.T.'s bottle even after Lopez reminded her of the correct amount of water to add.

Tiffany McFarland also observed five of the parent-child visits between Mother, Father, and A.T. While she testified the parents interacted appropriately with A.T. and appeared to love him, she had concerns about their poor hygiene and their inability to take corrective criticism.

She observed dirty spots on their clothes and said this was a concern because A.T. is always touching things. She was uncomfortable with the thought of A.T. touching the unknown substances and then putting his hands in his mouth.

A.T. was in a foster-to-adopt household and Lopez described the home as very clean, with everything in order. A.T. had his own room. He described the foster parent as "[being] on top of all of [A.T.'s] medical needs."

In contrast, Mother and Father told the court that if A.T. was taken away from them, they wanted him to go to the Marks family. Mother met Mr. Marks outside a gas station when Mr. Marks was walking his dog. She said they immediately became best friends and are like family.

The Marks participated in a home study, but CPS did not recommend them as an option for A.T. They lived in a three-bedroom apartment with four other family members. They also had multiple animals living in the apartment. The investigator stated "the home environment is not safe for a small child due to the unsanitary living conditions," which included animal feces on the floors. Mr. Marks reported self-harming behaviors, likely the result of his posttraumatic stress disorder. Neither Mr. nor Mrs. Marks worked, but relied on social security and disability.

The trial court ruled that it was in the best interest of A.T. to grant the State's request for termination "on D and E grounds as well as best interest grounds" and named CPS the permanent managing conservator. This appeal followed.

## Standard of Review and Applicable Law

A trial court may terminate the parent-child relationship if the fact-finder determines that: (1) a parent committed one or more of the enumerated statutory acts in section 161.001(1) of the family code, and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. §161.001(1), (2) (West 2012). Both elements must be established; termination may not be based

–4–

solely on the best interest of the child. *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §161.001. "Clear and convincing evidence" is the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *See In re M.V.*, 343 S.W.3d 543, 546 (Tex. App.—Dallas 2011, no pet.).

On appeal, we apply a standard of review that reflects this burden of proof. *Id.* In conducting a factual sufficiency review, we must give due deference to any evidence the fact-finder could reasonably have found to be clear and convincing. *Id.*; *see also In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We consider whether the disputed evidence is such that a reasonable fact-finder could not have resolved the disputed evidence in favor of its finding. *In re M.V.*, 343 S.W.3d at 546. If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

The trial court determined Mother and Father knowingly placed or knowingly allowed A.T. to remain in conditions or surroundings which endangered his physical or emotional well-being and that they knowingly placed A.T. with persons who engaged in conduct which endangered A.T.'s physical and emotional well-being. *See* TEX. FAM. CODE ANN. §161.001(1)(D), (E). "Endanger" means to expose to loss or injury, to jeopardize; it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *In re M.V.*, 343 S.W.3d at 546.

Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *In re M.C.T.*, 250 S.W.3d at 168. To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child nor is the child required to suffer injury. *Id.* at 168–69.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *Id.* Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*

When deciding whether termination is in the best interest of a child, the following factors are considered: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and some factors may be inapplicable to some cases. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## Discussion

Because the evidence pertaining to subsections 161.001(1)(D) and (E) are interrelated, we conduct a consolidated review. *See, e.g., In re M.C.T.*, 250 S.W.3d at 169; *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.). Mother and Father both argue the evidence is factually insufficient to support termination because (1) although the condition of the hotel room was less than ideal, it does not support termination; (2) the evidence does not show they deliberately, voluntarily, or consciously placed A.T. with anyone who endangered him; (3) the real problem was the mental deficiency of both parents; however, termination was not sought on this ground; and (4) parental rights should not be terminated because of smelling like smoke or other offensive body odor. We disagree with Mother's and Father's arguments.

Unsanitary conditions can quality as surroundings that endanger a child. *See In re C.L.C.*, 119 S.W.3d 382, 393 (Tex. App.—Tyler 2003, no pet.). Here, the evidence showed A.T. was living in "deplorable" and "just filthy" conditions two weeks after his birth. The room was in complete disarray, clean clothes were mixed in with dirty clothes, and animal feces were visible on the floor. Moreover, the room smelled of smoke, mold, urine, and feces. Other than the can of milk Mother produced when asked what she was feeding A.T., there were no other baby care essentials such as a crib, diapers, or cleaning supplies in the room.

Mother agreed the room needed to be cleaned but thought it was "pretty safe." Later when showed pictures of the room, she admitted "this is not good, no." Father admitted all the clutter in the room was a potential fire hazard. He also admitted that loose tobacco was sitting on a table because they rolled their own cigarettes.

Both parents readily acknowledged the condition of the room but made excuses that they planned on cleaning it the morning before CPS arrived, and the smell was really due to an overflowing toilet that maintenance had failed to fix. When Father was asked why he did not

clean the room himself, he claimed the hotel management would not let him use a vacuum. Thus, despite recognizing the hotel room was not fit for a newborn, neither parent took any affirmative steps to try and remedy the deplorable conditions.

In addition to the condition of the room, both parents acknowledged they were possibly putting A.T. in a dangerous situation by co-sleeping. Specifically, Mother admitted co-sleeping was dangerous, but she did it anyway. Father said he learned from parenting classes it was unsafe, but he did not think he endangered A.T. because they kept the pillows and blankets away from his face.

While perhaps not a sole reason supporting termination, Mother's and Father's poor hygiene must certainly be considered. Several witnesses testified to their overwhelming body odor, to the point they left a scent after leaving a room. On at least one occasion, day care workers reported it was necessary to bathe A.T. when he returned from a visit with Mother and Father, which indicated their poor hygiene was in fact impacting A.T. Moreover, a CPS worker expressed concern about Mother's and Father's dirty clothes. Because A.T. constantly put things in his mouth, she was afraid he might touch the unknown substances on their clothes and then put them in his mouth.

Evidence also supports Mother and Father hesitated in considering A.T.'s medical needs. Father and Mother initially expressed a negative reaction when told A.T. needed to wear a helmet because of a lump in his skull. They said "a boy does not need a helmet."

Accordingly, considering the record as a whole, the fact-finder could reasonably form a firm conviction or belief Mother and Father violated subsections 161.001(1)(D) and (E) by knowingly allowing A.T. to remain in conditions that endangered his physical and emotional well-being and knowingly placing A.T. with a person who engaged in conduct that endangered his emotional and physical well-being.

In reaching this conclusion, we reject both Mother's and Father's argument as to their mental capacity. Mother's IQ composite test was 62, which "falls into the Lower Extreme range of general intelligence." She asserts that her low IQ rendered her incapable of knowing and recognizing any danger to A.T. We disagree. Courts have held that limited mental capacity does not, as a matter of law, negate a parent's ability to knowingly neglect their child. *See In re L.S.R.*, 60 S.W.3d 376, 381 (Tex. App.—Fort Worth 2001, pet. denied), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002); *E.L.B. v. Tex. Dep't of Human Servs.*, 732 S.W.2d 785, 787 (Tex. App.—Corpus Christi 1987, no writ) ("We will not assume that the person with the mental capacity of an eight-year-old is incapable of knowledge or awareness that these living conditions were dangerous to the physical and emotional well-being of these small children."). Thus, her argument is without merit. As to Father, he scored a composite IQ score of 92, which fell in the average intelligence category; therefore, any argument as to his "limited mental abilities" is untenable. We overrule Mother's and Father's first and second issues.

We now consider whether termination of parental rights was in A.T.'s best interest. A.T. was too young at the time of trial to articulate his desires; therefore, the first *Holley* factor is inapplicable.

As to the second factor, Mother and Father both showed an inability to provide for A.T.'s physical and emotional needs. They expressed an initial reluctance to use a helmet to correct a cranial lump, and neither quit smoking despite A.T.'s constant upper-respiratory infections. A further concern is Mother's inability to read. She admitted she relied on Father to help her, but the possibility exists Father may not be present during a situation that requires Mother to read, such as administering the correct dose of medicine to A.T. Mother also had difficulty on three occasions correctly mixing A.T.'s bottles. Furthermore, she admitted she was concerned A.T.

may have been subjected to more shots than necessary because she could not find his shot records.

The emotional and physical danger to A.T. now and in the future likewise supports termination. As detailed above, Mother and Father took a newborn to a filthy hotel room. They admitted to co-sleeping despite knowing the potential danger. Their poor hygiene was a danger to A.T.

The record also indicates they moved from place to place with some frequency after A.T.'s removal, and at one time, they lived with the Marks family. The condition of the Marks' household, as noted in their home study, was filthy and likewise had animal feces in the rooms.

Moreover, the home study noted concerns about the mental stability of Mr. and Mrs. Marks. Yet, these were the people Mother and Father considered "like family," and their only true support in Texas. It is reasonable to consider that Mother's and Father's "support system" could be detrimental to A.T.'s emotional and physical well-being. Mother herself even admitted she had no close relationships with anyone else in Texas besides the Marks. She said she did not think it was important to develop more relationships because she does not trust people.

As to the fourth factor, we agree the record shows Mother and Father interacted appropriately with A.T. during visits, which shows some positive parenting ability on their part. However, the record also indicates they missed many visits with A.T., stepped outside to smoke before visits despite A.T.'s congestion problems, and Mother did not believe the parenting classes taught her anything she did not already know.

The evidence introduced at trial did not specifically address the fifth factor, which concerns any programs available to assist Mother and Father in promoting the best interest of A.T. The evidence, however, did show they failed to complete the recommended life skills class

prior to trial. And as discussed above, Mother and Father did not have any support in Texas other than the Marks family.

As to the sixth factor, which involves evidence regarding the parties' plans for A.T., Father did not testify as to his future plans for him. Mother, however, testified she wanted him to "grow up and be happy." She said her immediate plans were to take him to a hotel room (different from the one he was originally removed) and shortly thereafter move to an apartment through a second-chance program. She had not considered schools yet because A.T. was too young.

The Department of Family and Protective Services intended for A.T. to be adopted by a foster parent. The foster home had a room for A.T. and was described as very clean. The foster parent did not smoke and was attentive to A.T.'s medical needs.

The seventh factor, the stability of the proposed placement, weighs heavily against Mother and Father. They do not have a stable home, but rather have lived in various motels and apartments since A.T.'s removal. Neither parent has stable employment. Mother testified she has never worked a day in her life but lives on social security and food stamps. She claimed Father would be getting a job soon because he had applied to Pizza Inn and Pizza Hut. Father testified he worked as an evangelist and his salary varied depending on how much a church was willing to pay him. He also receives social security.

Additionally, Mother voluntarily gave up custody of her two oldest children from a previous marriage to relatives. While living in Missouri, Mother and Father had their two older children removed by CPS. Given their history of not providing for their other children, the court could reasonably determine they were unlikely to provide stability to A.T.

The parents' acts and omissions indicating the existing parent-child relationship is improper have been adequately detailed. Finally, the last *Holley* factor to consider is any excuse

by the parents for their acts or omissions. Father did not provide any excuses to the court, and his attempt to argue on appeal that he has limited mental capacity is without merit. While the court could consider Mother's low IQ, this alone does not weigh heavily against a finding of termination. *See In re L.S.R.*, 60 S.W.3d at 381; *E.L.B.*, 732 S.W.2d at 787.

Considering the record as a whole, clear and convincing evidence supports the trial court's determination that termination of parental rights was in A.T.'s best interest. We overrule Mother's and Father's third issue.

## Conclusion

Having determined the evidence supports the trial court's ruling that Mother and Father violated sections 161.001(1)(D) and (E) of the family code and termination is in the best interest of A.T., we affirm the trial court's judgment. *See* TEX. FAM. CODE ANN. §161.001(1), (2).

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE

130497F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF A.T., A CHILD

No. 05-13-00497-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas

Trial Court Cause No. 12-00305-W.

Opinion delivered by Justice O'Neill, Justices Moseley and Lewis participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that the State recover its costs of this appeal from appellants Tony Tripoli and Tina Tripoli.

Judgment entered this 10th day of July, 2013.

/Michael J. O'Neill/

MICHAEL J. O'NEILL
JUSTICE

–13–