**Affirmed and Opinion Filed November 12, 2024**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-24-00939-CV**
**No. 05-24-00940-CV**

**IN THE INTEREST OF D.G., A CHILD**
**IN THE INTEREST OF J.G., A CHILD**

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. DF-22-16659-S & DF-23-17577-S**

## MEMORANDUM OPINION

Before Justices Smith, Miskel, and Breedlove
Opinion by Justice Breedlove

Mother appeals from the trial court's orders terminating her parental rights to D.G. and J.G. In four issues, she contends the evidence was legally and factually insufficient to support the trial court's findings under family code sections 161.001(b)(1)(D), (E), and (O), and its findings that termination of Mother's parental rights is in the children's best interest. For the reasons explained below, we affirm the trial court's orders.

BACKGROUND

D.G., J.G., and two other siblings[1] were removed from Mother's home in November 2022 after the Texas Department of Family and Protective Services (Department) received and investigated a report of "neglectful supervision." D.G. was six years old and J.G. was four at the time of their removal.

The relevant facts were related by several witnesses at trial in 2024. The trial court heard testimony from Kameka Hewitt, a Department investigator; Jaquelyne Linares, a Department permanency supervisor; Atina Mann, a permanency specialist and case manager; and CJ Jones, a Court Appointed Special Advocate (CASA).[2]

Hewitt testified that she interviewed both D.G. and J.G. at school in response to the neglectful supervision report. In the interview, D.G. confirmed to Hewitt that she and her siblings "go to school dirty oftentimes because their clothing is not clean because their mom doesn't wash." D.G. also made sexual abuse allegations against Mother and Mother's father ("Grandfather"), and reported physical abuse by

---

[1] The trial court's rulings regarding the children's step-sibling L.G. are the subject of a separate appeal. *In re L.G.*, No. 05-24-00764-CV, 2024 WL 4441312, at *1–3 (Tex. App.—Dallas Oct. 8, 2024, no pet. h.) (mem. op.). The trial court's rulings regarding the children's step-sibling C.G. were not challenged in either appeal.

[2] In a suit filed by a governmental entity seeking termination of the parent-child relationship, the trial court must appoint both a guardian ad litem and an attorney ad litem for the children. TEX. FAM. CODE ANN. §§ 107.011 (mandatory appointment of guardian ad litem); 107.012 (mandatory appointment of attorney ad litem). The court may appoint an attorney "to serve in the dual role," as the trial court did here, appointing Blanca Espinosa "attorney and guardian ad-litem" for the children. *Id.* § 107.0125 (appointment of attorney in dual role). Although a trial court may appoint a "charitable organization composed of volunteer advocates" as a child's guardian ad litem, it did not do so here. *See id.* § 107.011(b)(1). The court's "Order Appointing CASA Special Advocate" provided only that "[t]he CASA representative shall conduct an inquiry into any and all circumstances, conditions and placement(s) and appear at any and all hearings concerning the children." Jones, the CASA advocate for the children in this case, testified that she had been involved in the case since November of 2022.

Mother. J.G. confirmed "about the clothing being dirty, and he also made physical abuse outcries" against Mother.

Law enforcement personnel were contacted, arrived at the school, and were briefed on the children's statements. Hewitt testified that they then waited for Mother to arrive to pick up the children. Mother arrived with another child in the car, and the officers attempted to approach her. But Mother "sped away from the school and led officers on a police chase with [the other child] in the car with her."

D.G., J.G., and a fourth sibling were transported to the Dallas Children's Advocacy Center for forensic interviews. D.G. gave "full disclosures on the sexual abuse from [Grandfather] and [Mother]." Hewitt explained that D.G. "was very graphic" about the abuse by her grandfather:

> She stated that he put his hands over her vagina. He placed her face on his penis. He shook while he was laying down in a position, like, he was giving—having a baby. And he peed, but she described the pee as green, slimy stuff came out over her face.

Regarding Mother, D.G. "stated that her mom had been showing her pictures—nude pictures of her mom's boyfriend that lived in Fort Worth while he was in the shower."

J.G. did not report any sexual abuse. He "only reported about his mother punching him in the stomach."

In the interview, D.G. also reported that she told Mother about the abuse by Grandfather "immediately after that incident happened, once her mother returned home," but Mother did not believe her. According to Hewitt's report of the

–3–

interview, Grandfather "had already called [Mother] and stated that [D.G.] had attempted to come on to him sexually." D.G. stated that Mother did not believe her and "punched her in the face" for telling lies about Grandfather.

The Department filed an "Original Petition for Protection of a Child, For Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship" on November 16, 2022, seeking among other relief the termination of Mother's parental rights to D.G. and J.G. "if reunification with the mother cannot be achieved."

Hewitt visited Grandfather's home where Mother and the children had been living. When law enforcement arrived at the residence, the occupants refused to open the door, and a forced entry was required. Hewitt described the home as "filthy, for lack of better words." Mother and all four children slept in one room that did not have working electricity. The room had two beds and no safe sleeping options for J.G. and another sibling. There were locks on the outside of the bedroom doors. Clothes were piled on the floor in the laundry room, and there was no clean clothing for the children. Some of the food in the kitchen appeared to have been sitting out for some time as it was beginning to mold. There was a large dresser with a television on top blocking the door in the living room. Hewitt testified she did not know if the dresser was moved there to keep law enforcement out of the residence.

After the children were removed and the Department was named temporary managing conservator for the children, the children were placed in foster care. The

Department continued its investigation, largely without Mother's cooperation. Hewitt testified that Mother "never really complied" with the Department's subsequent investigation of the children's allegations. Hewitt was able to speak to Mother once on a Zoom call, but Mother's concerns were limited to knowing what allegations had been made against her and Grandfather. Mother "completely denied" the allegations and stated that Hewitt "coerced [D.G.] to say those things about [Grandfather] and that none of those things were true."

Mother was initially permitted to have supervised visitation with the children, but the visits did not go well. Hewitt testified that although Mother was admonished not to discuss the removal or the allegations with the children, Mother began to talk about the removal and the sexual abuse allegations as soon as her visit started. Hewitt reminded Mother three times not to talk about the allegations or the visit would be cancelled. On the third warning, Hewitt cancelled the visit. Hewitt testified, however, that there was some meaningful interaction between Mother, D.G., and J.G. Mother hugged the children when she first arrived and told them how much she loved them, missed them, and intended to get them back.

In a subsequent visit, Mother cursed in front of the children and threatened the staff, which resulted in Mother's arrest. Mother fought with law enforcement in front of the children, which caused the children to scream, throw tantrums, and mimic Mother's behavior. J.G. punched and cursed the staff. Hewitt described the visit as "total chaos."

Linares testified that Mother's supervised visitations were suspended by the court due to Mother's behavior. The behavior included asking the children for their foster parents' identifying information, telling the children they would be coming home soon, and telling the children it was the Department's fault the children were not at home with her. Linares also testified that the children would act out in their foster home following visits with Mother.

Jones testified that her interactions with Mother had not been positive. Mother was aggressive towards Jones at the supervised visits, threatening Jones by calling her "the B word," stating that Jones was interfering with her children, and showing Jones pictures of Mother holding a gun. Mother wrote messages on the children and told them incorrect information. Jones stepped in to stop a visit because of the language Mother was using with the children. At one visit, Mother "grabbed [J.G.] by his shirt when she got upset that he dropped a cupcake and basically just started shaking him" until Jones stepped in to "get [J.G.] out of [Mother's] hands." At one of the visits, Mother told D.G "to use inappropriate behavior with the foster parents so they could return her home. She encouraged it." Mother made negative comments about the children's haircuts and made "a lot of negative statements that should not have been stated to children."

Jones was also concerned about Mother's mental health. Jones explained that Mother "didn't recall meeting me at a previous supervised visit, which it was a very aggressive interaction, for lack of a better term. And so for her not to recall me at all

the following week was a concern." Mother also refused CASA's help with transportation for services, telling Jones that she did not need the services.

Mother was present at a temporary orders hearing before an associate judge on December 28, 2022, although the judge's order reflects that she "left early." At that hearing, Mother was ordered "to participate in: Parenting classes, psychological evaluation, Individual Counseling and Domestic Violence Counseling, drug/alcohol assessment, random drug & alcohol urinalysis/hair strand tests AND FOLLOW THROUGH WITH RECOMMENDATIONS made by any of these service providers as arranged and paid for by TDFPS." Subsequent status hearing orders continued these requirements.

Mother did not cooperate with the Department in trying to find an alternative placement for the children so that they would not have to be placed in foster care. Hewitt testified that Mother did not acknowledge any responsibility for the children's removal or acknowledge that she might do better in the future. Hewitt testified that Mother's only concern was defending Grandfather against D.G.'s sexual-abuse allegations.

In a "Permanency Hearing Order Before Final Order" signed on December 26, 2023, an associate judge found that Mother "has not demonstrated adequate and appropriate compliance with the service plan." The court also found that "there is a continuing danger to the physical health or safety of the children; and returning [D.G. and J.G.] to [Mother] is contrary to the welfare of the children." Other findings

supported the court's order that D.G. and J.G. remain in their current foster homes. The court found that visitation between Mother and the children was not in the children's best interest because of Mother's "various problematic behaviors during visitation." The court suspended Mother's visitation until Mother could "show positive behavioral changes."

When the case proceeded to trial on April 30, 2024, Mother was represented by counsel but did not appear or testify. After hearing the evidence, the trial court took the cases under advisement. The court issued a memorandum ruling on May 9, 2024, and rendered orders terminating Mother's parental rights on July 11, 2024 (as to D.G.) and on July 12, 2024 (as to J.G.). This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

Mother's first three issues challenge the legal and factual sufficiency of the evidence to support the trial court's findings under family code sections 161.001(b)(1)(D), (E), and (O). Mother's fourth issue challenges the trial court's findings that termination of Mother's parental rights to D.G. and J.G. is in the children's best interest.

In conducting a legal sufficiency review in a parental termination case, we determine whether the evidence, viewed in the light most favorable to the finding, is such that a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "[L]ooking at the evidence in the light most favorable to the judgment means that a reviewing court

–8–

must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* We disregard all evidence "that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

In a factual sufficiency review in a parental termination case, we consider the entire record, including evidence both supporting and contradicting the finding, and determine whether a reasonable factfinder could have formed a firm conviction or belief about the truth of the allegation. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

### DISCUSSION

A trial court may terminate the parent-child relationship if the fact-finder finds by clear and convincing evidence that (1) the parent committed one or more of the enumerated acts or omissions justifying termination under family code § 161.001(b)(1), and (2) termination of parental rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1)(A)–(V), (2). Both elements must be established, and each required finding must be based on clear and convincing evidence. *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied).

Mother also requests that we address all of her issues because the trial court's findings in this case "could substantially affect her future rights based on

[§] 161.001(b)(1)(M)." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(M);[3] *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) ("[B]ecause section 161.001(b)(1)(M) alone provides a sufficient basis to terminate parental rights based on a previous section 161.001(b)(1)(D) or (E) finding, the due process concerns, coupled with the requirement for a meaningful appeal, mandate that if a court of appeals affirms the termination on either of these grounds, it must provide the details of its analyses.").

**1. Family code § 161.001(b)(1)(D) and (E)**

Family code § 161.001(b)(1)(D) provides that "[t]he court may order termination of the parent-child relationship if the court finds by clear and convincing evidence" that "the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Subsection (D) addresses the child's surroundings and environment, and requires proof of endangerment. *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.). "Endanger" means "to expose to loss or injury, or to jeopardize a child's emotional or physical health," but "it is not necessary that the conduct be directed at the child or that the child actually suffer an injury." *Id.*; *In re A.T.*, 406 S.W.3d at 370.

---

[3] Subsection (M) permits termination where the court finds by clear and convincing evidence that the parent has "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) . . . ." TEX. FAM. CODE ANN. § 161.001(b)(1)(M).

Family code § 161.001(b)(1)(E) provides that "[t]he court may order termination of the parent-child relationship if the court finds by clear and convincing evidence" that "the parent has . . . engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Like subsection (D), subsection (E) requires proof of endangerment. *In re J.D.B.*, 435 S.W.3d at 463. Subsection (E), however, addresses parental misconduct. *Id.*

As we have recently explained, "the state of the law under subsection[s] (D) and (E)" is as follows:

- Subsection (D) addresses the child's surroundings and environment, while subsection (E) addresses parental misconduct. However, parental conduct is relevant to the child's environment under subsection (D).

- Termination of parental rights under subsection (D) can be based on a single act or omission. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

- Under both subsections, the trial court may consider endangering conduct that occurred before and after the child's birth and conduct that occurred in and out of the child's presence.

- Under subsection (E), the trial court may consider events that occurred after the child is removed by the Department.

- It is not necessary for conduct to be directed at the child or for the child to actually suffer injury for endangerment to exist. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

*In re T.J.*, No. 05-22-00954-CV, 2023 WL 1988838, at *3 (Tex. App.—Dallas Feb. 14, 2023, no pet.) (mem. op.) (citing *In re R.B.*, No. 05-21-00043-CV, 2021 WL 2943927, at *7–9 (Tex. App.—Dallas July 9, 2021, no pet.) (mem. op.)).

We first address Mother's arguments regarding D.G. Mother argues that "the only testimony regarding the child D.G. being in poor conditions or surroundings is the allegation of sexual abuse by the grandfather." Mother contends there is no evidence, other than hearsay, to support a finding that she knew about the abuse, and no evidence the abuse actually occurred. Mother adds that there is no evidence of any criminal charges that have been filed or pursued arising from the alleged sexual abuse.

Mother also argues that "there is no timeline given as to the sexual abuse allegations against the maternal grandfather." She contends "[i]t could have been the morning of the removal and the Mother has had no opportunity to address it herself as a parent without committing the act described by subsection (E)." She argues that "[a] reasonable fact-finder could not be certain by clear and convincing evidence that the alleged abuse occurred **and** that the Mother actually knew that the alleged abuse occurred or was likely to occur."

> Hewitt testified, however, that D.G. told Mother about the abuse:
>
> Q. Were there—did either child ever state they told their mother about the sexual abuse?
>
> A. Yes. [D.G.] did report that immediately after that incident happened, once her mother returned home, she stated that she told her. And then

her grandfather had already called her mom and stated that [D.G.] had attempted to come on to him sexually.

So her mom didn't believe her and she punched her in the face for lying on the grandfather.

Hewitt also testified that Mother "never really complied" with the subsequent investigation, and "completely denied" the allegations about Grandfather. And as we have discussed, D.G., then age six, gave specific and graphic details of Grandfather's abuse in a forensic interview. Linares, too, testified that Mother did not believe D.G. and denied D.G.'s outcry. According to Linares, Mother wanted Grandfather "to also have communication with the kids" and to visit.

As to J.G., Mother argues there is only hearsay evidence that she "physically punched" J.G. Hewitt testified that J.G. "reported about his mother punching him in the stomach," but Mother contends there is "no evidence about how often that may or may not have occurred, or if the child was injured by it," and "no evidence about the strength of the physical touch." Jones testified that J.G. "confirmed the hitting, punching" by Mother, and "described it as punching him in his chest, were the words that he used for me."

As to both children, Mother argues that "[t]he testimony here is not substantial enough to find that the Mother engaged in conduct which endangered the physical or emotional well-being of D.G. or J.G." Mother further argues that the only evidence of the children's physical living conditions "is the testimony of Hewitt who visited the residence once." She contends that one visit is not sufficient to establish

the usual state of the home, and Hewitt testified only that the home was "filthy" and "there was old food mixed in with new food" in the kitchen. Mother argues that "[t]o terminate a parent's rights based on dirty clothes does not rise to the level of endangerment required by the statute."

We disagree that the only evidence supporting the trial court's findings is Hewitt's testimony that Mother failed to do the laundry or clean the kitchen. Hewitt also testified that the children slept in a locked bedroom lacking electrical power or a sufficient number of beds. In addition to the these physical conditions, Mother failed to undertake the counseling or services offered to her to help her regain custody of her children, leading Jones to testify that Mother did not "gain[ ] some understanding or some appreciation on how to protect the children during the course of this case."

Further, the home where Mother and the children were living was Grandfather's. The conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *In re J.D.B.*, 435 S.W.3d at 464. "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is a part of the 'conditions or surroundings' of the child's home under section 161.001(b)(1)(D)." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). "A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards." *Id.*

We conclude the evidence is sufficient to support termination of Mother's parental rights as to D.G. and J.G. under both subsections (D) and (E). As we have explained, subsection (D) permits termination based on a single act or omission, *In re T.J.*, 2023 WL 1988838, at *3, while subsection (E) termination must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by a parent. *In re A.T.*, 406 S.W.3d at 370; *In re A.B.*, No. 05-23-00667-CV, 2023 WL 8863490, at *9 (Tex. App.—Dallas Dec. 22, 2023, pet. denied) (mem. op.). "A parent's steadfast refusal to believe a child's outcry and meaningfully limit the alleged abuser's access demonstrates a pattern of conduct endangering the child's physical or emotional well-being." *Id.* (citing *In re M.H.*, No. 05-22-00017-CV, 2022 WL 3135919, at *6 (Tex. App.—Dallas Aug. 5, 2022, no pet.) (mem. op.) (Mother's refusal to believe child's outcry despite Father's previous inappropriate sexual conduct with other family members traumatized child and demonstrated pattern of endangerment to child's well-being)). Mother's repeated denials of Grandfather's conduct, her continued insistence that D.G. was not truthful, and her refusals to obtain any help or counseling for herself or for the children constitute more than a single act or omission.

Viewing the evidence under the applicable standards of review, we conclude a reasonable factfinder could have formed a firm belief or conviction that Mother "knowingly placed or knowingly allowed" D.G. and J.G. "to remain in conditions or surroundings which endanger[ed]" their physical or emotional well-being, and

that Mother "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct" which endangered D.G.'s and J.G.'s physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *In re J.F.C.*, 96 S.W.3d at 266 (legal sufficiency); *In re C.H.*, 89 S.W.3d at 25–26 (factual sufficiency). We overrule Mother's second and third issues.

**2. Family code § 161.001(b)(1)(O)**

Family code § 161.001(b)(1)(O) provides that "[t]he court may order termination of the parent-child relationship if the court finds by clear and convincing evidence" that the parent has:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re J.F.C.*, 96 S.W.3d at 277 (discussing application of subsection (O)). In her third issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding under subsection (O). She argues (1) no service plan was admitted into evidence, and (2) there is no evidence that the Department set up services for her and no evidence that Mother failed to comply with any service plan, because none of the witnesses had personal knowledge of the relevant facts. Mother contends that Mann, the only witness who testified about a service plan, had been assigned to the case for less than

a month at the time of trial. She concludes that the Department failed to proffer clear and convincing evidence to support a finding under subsection (O).

The Department concedes that "the signed service plan is not in the record." The Department argues, however, that the trial court's temporary order, status hearing order, and permanency order were all admitted into evidence at trial without objection. The Department's Exhibit 6 is a temporary order rendered after a contested hearing on December 28, 2022. In it, the associate judge ordered Mother to participate in parenting classes, a psychological evaluation, individual counseling and domestic violence counseling, drug/alcohol assessment, random drug and alcohol urinalysis/hair strand tests, "AND FOLLOW THROUGH WITH RECOMMENDATIONS made by any of these service providers as arranged and paid for by TDFPS."

The subsequent hearing orders admitted into evidence as Department Exhibits 3 and 4 provide that "[t]he prior Orders in this cause shall be continued in full force and effect, except as changed herein." Exhibit 3, made following a status hearing on January 11, 2023, includes the court's findings that Mother "has reviewed and understands the service plan" and understands the consequences of failing to comply.[4] Exhibit 4, made after a permanency hearing on February 8, 2023, includes the court's findings that Mother "has not complied with the case plan of services

_____

[4] The order reflects that Mother did not appear in person at the hearing, but her attorney was present.

–17–

prepared for the family," and "is not presently <u>able or willing</u> to provide the child(ren) with a safe environment." The court also found that "Mother has reviewed and understands the service plan" and the consequences of failure to comply in a reasonable period of time. Exhibit 4 reflects that Mother was present at the hearing.

Further, Mann was not the only witness who testified to Mother's failure to comply with the service plan. Linares testified that she supervised the previous caseworker on the case between October 2023 and January 2024. During that time, Linares reviewed the case file and became familiar with it. Linares testified that Mother was offered parenting classes, a psychological evaluation, individual counseling, substance abuse assessment and treatment, and was ordered to undergo random drug testing. Mother completed a psychological evaluation in September 2023, and received similar recommendations including parenting classes, counseling, substance abuse assessment and treatment, "and also a psychiatric evaluation for consideration for psychotropic medication, and for her to maintain a stable home environment and employment," according to Linares. Linares testified that Mother did not complete any of these services.

In addition to Linares's and Mann's testimony, Jones testified that CASA offered help with transportation for services, but Mother refused. According to Jones, Mother "stated, no, that she didn't need the services." Mother also refused CASA's offer of transportation for a court-ordered drug test.

Mother took a drug test in September 2023 that was positive for methamphetamines and amphetamines. The Department made three requests for further testing, but Mother did not comply. Mother also completed a psychological examination in September 2023, but did not comply with the examiner's recommendations for further psychiatric evaluation.

Mother does not dispute that she did not comply with the court's orders to participate in services; her only argument is that the Department did not make the arrangements for her to do so. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (conduct required under subsection (O) was established as a matter of law where parent did not dispute she failed to comply with court orders, child was removed from parent for abuse or neglect, and child was in Department's custody for more than nine months after removal). Viewing the evidence under the applicable standards of review, we conclude a reasonable factfinder could have formed a firm belief or conviction that Mother failed to comply with the provisions of a court order specifically establishing the actions necessary for Mother to obtain return of D.G. and J.G. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re J.F.C.*, 96 S.W.3d at 266 (legal sufficiency); *In re C.H.*, 89 S.W.3d at 25–26 (factual sufficiency). We overrule Mother's third issue.

**3. Family code § 161.001(b)(2)**

Before terminating a parent's rights under § 161.001(b)(1), the trial court must also find that "termination is in the best interest of the child." TEX. FAM. CODE ANN.

§ 161.001(b)(2). The trial court made specific findings "by clear and convincing evidence" that terminating the parent-child relationship between Mother and D.G. and Mother and J.G. is in the children's best interest.

There is a strong, rebuttable presumption that the best interest of a child is served by keeping the child with a parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE ANN. § 153.131(b)); *In re R.D.P.*, 526 S.W.2d 135, 137 (Tex. Civ. App.—Dallas 1975, no writ). This presumption is "based upon a logical belief that the ties of the natural relationship of parent and child ordinarily furnish strong assurance of genuine efforts on the part of the custodians to provide the child with the best care and opportunities possible, and, as well, the best atmosphere for the mental, moral and emotional development of the child." *Mumma v. Aguirre*, 364 S.W.2d 220, 221 (Tex. 1963). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *In re J.C.N.*, No. 05-21-01163-CV, 2022 WL 1284169, at *7 (Tex. App.—Dallas Apr. 29, 2022, no pet.) (mem. op.).

We look to certain non-exclusive factors enumerated by the supreme court in *Holley v. Adams* in determining the child's best interest. 544 S.W.2d 367, 371–72 (Tex. 1976). These include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote

the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* at 372.

Evidence is not required on all of these factors to support a best interest finding, *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); thus, the absence of evidence on some of these factors does not preclude a best interest finding, "particularly if undisputed evidence shows the parental relationship endangered the child's safety," *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.). "Indeed, evidence relating to one factor may be adequate in a particular case to support a finding that termination is in the best interest of the child." *In re C.S.*, No. 05-24-00332-CV, 2024 WL 3933885, at *8 (Tex. App.—Dallas Aug. 21, 2024, no pet. h.) (mem. op.).

Mother argues the evidence is insufficient to overcome the presumption that the children's "best interest is with the natural parent," or to show that termination is in the children's best interest. *See In re C.V.L.*, 591 S.W.3d 734, 754 (Tex. App.—Dallas 2019, pet. denied) ("[T]here is a strong presumption that a child's best interests are served by preserving the parent-child relationship, where possible." [internal quotations omitted]).

## A. The desires of the children

No evidence was offered or admitted regarding either D.G.'s or J.G.'s desires.

## B. The emotional and physical needs of, and danger to, the children

Mother cites testimony that D.G. has never received counseling that specifically addresses the alleged sexual abuse, even though D.G. has been in the Department's care since December 2022. Jones testified that "the foster parents have asked on several occasions for [D.G.] to get additional services to address the sexual assault issue." Jones added that D.G. "literally brought the situation up directly with me without having to prompt her or ask any questions about it. So it is definitely something that is troubling and is to be expected for a young child." Jones testified that D.G.'s counseling had "addressed the separation from her siblings and the separation from her mom," but not the sexual abuse.

It is of some concern that the Department had not made the necessary arrangements by the time of trial. The trial court addressed the issue at trial, asking Jones if CASA had any resources "to address the sexual assault concerns with [D.G.]." In its termination order, the trial court ordered that D.G. "shall be enrolled in sexual abuse counseling through the Dallas Child Advocacy Clinic, Dallas Child Guidance Center, or Poetic Counseling, whichever is first available, as soon as possible." Further, given that Mother does not believe Grandfather abused D.G., there is no evidence that Mother would ensure D.G. receives the counseling to

address the issue. In contrast, the foster parents have requested the counseling on D.G.'s behalf.

As to J.G., Hewitt testified that Mother's behavior at the supervised visits caused the children "to be in a panic," and J.G. "punched staff and cursed staff out." Jones testified that J.G. "is a very sweet, young boy" who has "some behavioral issues" in his interactions with other children, his foster parents, "and anyone that's in a leadership role." But Jones explained her belief that "with long standing therapy," J.G.'s issues can be addressed, "[b]ecause overall, he is a very sweet, little boy."

Jones testified that J.G.'s behavior "did get better after Judge Lee terminated the supervised visitations. There was definitely some improvement after that." Jones explained, however, that J.G.'s behavior had "regressed a bit," in her opinion "just from the changes in the school environment." She testified, "But hopefully with him now being assigned a paraeducator to be with him daily, that the paraeducator assignment will help [J.G.] get back on a positive track."

Jones confirmed that the children "are currently safe where they are," and that "their needs are being met." She also testified to her belief that Mother's conduct could affect the children's safety, citing Mother's threats to her including that Mother "showed me a picture of her holding a gun and told me she was about that life and I better get out of her face."

–23–

Regarding the children's physical needs, Hewitt testified to the home's conditions that we have detailed above. Hewitt also testified to her belief that Mother had placed the children in danger.

Linares testified that she visited with the children in their foster homes. The foster parents explained that after visits with Mother, the children would "regress with their behaviors and act out in the foster homes," and "were being led to believe that they were going home soon." The children acted out, "[t]elling the foster parents . . . that they couldn't tell them what to do because it wasn't the mom," and coming home from the visits "with a sad demeanor."

We conclude the trial court could have reasonably formed a firm belief or conviction that the children's emotional and physical needs, and danger to them, weighed in favor of termination.

### C. The parental abilities of those seeking custody, their plans for the children, and the stability of the home or proposed placement

D.G. and J.G. are currently in separate foster homes, but the foster parents are sisters and the children see each other regularly. As Mother argues, however, there was no evidence showing that D.G. and J.G. have any contact with their other two siblings. She argues that the children "likely have a large network of biological family, and they need to maintain relationships with their siblings." Linares testified, however, that Mother did not provide any "alternate family or relatives to be considered" for the children's placement. Mother also wanted the children to have contact with Grandfather.

Mother concedes that she did not testify or offer any other evidence of her plans for the children. But she also argues that the Department's plans for the children are uncertain. She points out that neither D.G. nor J.G. is in a placement where adoption is a possibility.

The record reflects that all four children were initially placed together in a foster home, but when the other two children were placed with their fathers, D.G. and J.G. were moved to their current placements. Jones testified that one of the foster mothers was willing to take both D.G. and J.G., but "there was some miscommunication with her placement provider and she didn't realize that they were giving her a placement from another case at the same time." The foster mother suggested her sister as a placement the other sibling, "and that's how that came to be." Linares testified that both children are doing very well in their foster homes. Although neither home could accommodate both children, the foster parents "ensure that the children have constant communication," and the children "see each other on a regular basis." The children are both in therapy, and are "safe and protected."

Because the children are not in a permanent home as yet, this factor does not weigh conclusively in favor of termination.

### D. Any acts or omissions of the parent which may indicate the parent-child relationship is improper

Hewitt testified that Mother "was offered a visit within three days of the children being removed, but she did not show up for that visit." Hewitt was present at a subsequent visit when Mother was "cursing in front of the children" and

"threatening staff." Hewitt testified that Mother "was actually arrested by law enforcement at that visit and she fought with law enforcement in front of her children causing the children to scream and throw tantrums." Hewitt explained:

> So once the children saw all of that, it just—it caused them to be in a panic seeing what happened to their mom and seeing her respond in that way. The children—they began to mimic their mother's behavior. [J.G.] punched staff and cursed staff out. They began to cry and ask why were we having their mom arrested. It was just total chaos that day with the children.

Hewitt also testified that Mother did not suggest any possible placements for the child with other family. Instead, Mother was primarily concerned with challenging the children's removal and disproving D.G.'s complaints about the grandfather:

> So normally we take the children into care. We contact the parents. We try to get placement options to prevent the children from going into foster care. We were not able to do that in this instance. [Mother] did not want to cooperate with that. She was only focused on her father didn't do those things. The Department coerced them and we illegally removed her children. So we never got those placement options. The children then went into foster care.

Another visit "lasted, maybe, about 15 minutes," after Mother violated Hewitt's instructions not to talk with the children about the removal or the allegations relating to it. Hewitt testified,

> As soon as [Mother] got in the visit, she began to talk about the removal. She began to talk about the allegations of the sexual abuse. She was reminded two or three times that you cannot do that or the visit is going to be canceled. On the third time, I canceled the visit with her.

Hewitt explained, however, that before the visit was cancelled, there was also some "meaningful interaction" between Mother and the children. Mother told the children how much she missed them, how much she loved them, and how she was going to get them back, and D.G. and J.G. welcomed this attention.

Jones also testified that Mother's behavior at the visits was "definitely of concern and because of the language she would use with the children." Jones explained that Mother "told [D.G.] to use inappropriate behavior with the foster parents" so that the children could return to Mother's home, and made "a lot of negative statements that should not have been stated to children." We conclude this factor weighs in favor of termination.

### E. Any excuse for the parent's acts or omissions

Mother did not appear for the trial, although her attorney acknowledged that Mother had received notice. No evidence was offered or admitted regarding any excuse for Mother's actions. This factor weighs in favor of termination.

### F. Conclusion

Having reviewed the evidence under the applicable standards of review, we conclude there was legally and factually sufficient evidence to support the trial court's findings that terminating the parent-child relationship between Mother and D.G. and Mother and J.G. is in the children's best interest. TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266 (legal sufficiency); *In re C.H.*, 89 S.W.3d at 25–26 (factual sufficiency). We overrule Mother's fourth issue.

## CONCLUSION

We affirm the trial court's July 11, 2024 Order of Termination as to D.G. and its July 12, 2024 Order of Termination as to J.G.

/Maricela Breedlove/
MARICELA BREEDLOVE
JUSTICE

240939f.p05
240940f.p05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

IN THE INTEREST OF D.G., A CHILD

No. 05-24-00939-CV

On Appeal from the 255th Judicial District Court, Dallas County, Texas Trial Court Cause No. DF-22-16659-S.
Opinion delivered by Justice Breedlove. Justices Smith and Miskel participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 12th day of November, 2024.



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

IN THE INTEREST OF J.G., A CHILD

No. 05-24-00940-CV

On Appeal from the 255th Judicial District Court, Dallas County, Texas Trial Court Cause No. DF-23-17577-S.
Opinion delivered by Justice Breedlove. Justices Smith and Miskel participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 12th day of November, 2024.